Carroll
No. 2007-692

CHARLES H. SMITH

v.

LILLIAN V. DONAHUE TRUST

Argued: June 18, 2008
Opinion Issued: July 15, 2008

*Sager Law, P.L.L.C.,* of Ossipee (*Richard D. Sager* on the brief and orally), for the petitioner.

*Krasner Law Office,* of Farmington (*Emmanuel Krasner* on the brief and orally), for the respondent.

DALIANIS, J. The respondent, the Lillian V. Donahue Trust (Trust), appeals the order of the Superior Court (*Fitzgerald,* J.), granting the petition for specific performance filed by the petitioner, Charles H. Smith. We affirm.

The record supports the following facts. The Trust was created in 1991 by Lillian V. Donahue. It was a revocable trust that named Lillian as grantor, beneficiary and trustee. It named her son, Patrick J. Donahue (Donahue), as successor trustee and contingent beneficiary. Under the trust document, upon Lillian's death, all of the remaining "principal, real, personal or mixed and any accumulated net income" was to be paid to Donahue, and the Trust would terminate. The property in trust included approximately 200 acres of land on Horn's Pond in Wakefield.

In June 1993, Lillian resigned as trustee and named her attorney, Elmer E. Runyon, as a successor trustee to serve with her son as co-trustee. At that time, the Trust was further amended to require that, upon Lillian's

death, seventy-five percent of the remaining "principal, real, personal or mixed and any accumulated net income" was to be paid to Donahue, and the Trust would terminate as to the portion distributed to him. The remaining twenty-five percent was to be held in trust for his daughter and distributed to her when she turned twenty-five. During Lillian's lifetime, however, all of the net income from the trust property was to be paid to her, and the successor trustees were permitted to use as much of the principal as they, in their sole discretion, deemed necessary for her support and maintenance.

In September 1993, Donahue and Runyon, as successor trustees, filed a trustee certificate at the Carroll County Registry of Deeds, which stated, in pertinent part:

> The undersigned Trustees as Trustees under the LILLIAN V. DONAHUE TRUST . . . have full and absolute power in said Declaration of Trust to convey any interest in real estate and improvements thereon held in said Trust and no purchaser or third party shall be bound to inquire whether the trustees have said power or are properly exercising said power or to see to the application of any Trust asset paid to the Trustees for a conveyance thereof.

*See* RSA 564-A:7, II-III (Supp. 1994) (amended 1995).

The trust document gave "any successor Trustee" the power to, *inter alia*: (1) "collect, hold, and retain Trust assets . . . until, in the judgment of the Trustee, disposition of the assets should be made"; (2) "acquire an undivided interest in a Trust asset"; (3) "invest and reinvest Trust assets"; (4) "deposit Trust funds in a bank"; (5) "acquire or dispose of an asset, for cash or credit, at public or private sale"; (6) "manage, develop, improve, exchange, partition, change the character of, or abandon a Trust asset or any interest therein"; (7) "encumber, mortgage, or pledge a Trust asset for a term within or extending beyond the term of the Trust, in connection with the exercise of any power vested in the Trustee"; and (8) "borrow money to be repaid from Trust assets." *See* RSA 564-A:3 (1974) (amended 1996, 1998).

On June 30, 1996, Donahue entered into an agreement with Smith to sell him a house located on five acres of the Wakefield land held in trust, with approximately 550 feet of lake frontage. The agreement provided that although the property was not yet subdivided, it would be subdivided upon request. The agreement also provided that Smith would pay the $50,000 purchase price in installments, and that Donahue would hold the deed in escrow until Smith paid the final installment. The agreement did not

identify the property as being held in trust. Nor did it identify Donahue as trustee. Donahue and Smith were the only signatories.

Runyon resigned as trustee on June 19, 2000. Three months later, on September 20, 2000, Donahue and Smith entered into another agreement, which they termed an "allonge" to their original purchase agreement. The allonge, unlike the original purchase agreement, identified Donahue as the trustee of the Trust. Pursuant to the allonge, Donahue, as trustee, agreed to sell Smith an additional approximately three acres of the Wakefield land held in trust, with 200 feet of lake frontage.

Like the original agreement, the allonge provided that Smith would pay the purchase price in installments. The purchase price for the additional property was $50,000. Donahue signed the allonge twice: once "personally," and once as "Trustee." Smith was the only other signator.

In August 2002, Smith brought this petition for specific performance, alleging, among other things, that although he had already paid Donahue $70,000, Donahue had not conveyed any property to him, nor had he subdivided the Wakefield land as requested so that the conveyance could take place. Instead, he had placed the entire Wakefield lot for sale for $700,000.

After a bench trial, the trial court ruled that the 1996 agreement between Donahue and Smith was invalid because Donahue's co-trustee at the time, Runyon, had not authorized it. The court found, however, that the 2000 allonge ratified the 1996 agreement and made it binding upon the Trust. Impliedly finding that it was equitable to do so, the court granted Smith's petition for specific performance. Because Smith had not yet paid the entire $100,000 purchase price, however, the court ordered him to do so, and ordered the Trust to deed the disputed property to him provided that it was possible to subdivide Smith's parcel from the larger parcel. If this was impossible, the court ruled that Smith was entitled to be reimbursed for his payments.

We will not disturb the findings of the trial court unless they lack evidentiary support or are erroneous as a matter of law. *N.H. Dep't of Envtl. Servs. v. Marino*, 155 N.H. 709, 717 (2007). We review legal conclusions, as well as the application of law to fact, independently for error. *Id.* Our inquiry is to determine whether the evidence presented to the trial court reasonably supports its findings, and then whether the court's decision is consonant with applicable law. *Id.*

I

On appeal, the Trust first argues that the contracts between Donahue and Smith are void because Smith had actual or constructive knowledge that Donahue acted outside of the scope of his authority, without authori-

zation, and not to the benefit of the Trust. The Trust alleges that Donahue committed a breach of trust first, by entering into the 1996 agreement without his co-trustee's authorization or consent, and second, by using the money he received from Smith for his own purposes. The Trust argues that Smith's constructive knowledge of the first breach and/or his actual knowledge of the second deprives him of the remedy of specific performance.

## A

We first address whether Smith's constructive knowledge of any alleged breach of trust by Donahue suffices to void the contracts at issue. We hold that constructive knowledge is legally insufficient.

To support its assertion that constructive knowledge of Donahue's breach of trust suffices to void a contract, the Trust relies upon the RESTATEMENT (SECOND) OF TRUSTS § 288 (1959). This reliance is misplaced. The RESTATEMENT (SECOND) OF TRUSTS is a compilation of the common law. While at common law, constructive knowledge of a trustee's breach of trust could void a contract with a third party, the New Hampshire statute governing such transactions at the time required actual knowledge. *See* RSA 564-A:7, I (1997) (repealed 2004).

At common law, if a trustee in breach of trust transferred trust property to a person who took "with notice of the breach of trust," the conveyance was void. RESTATEMENT (SECOND) OF TRUSTS, *supra* § 288; *see Steves v. United Services Automobile Association*, 459 S.W.2d 930, 934-35 (Tex. Ct. Civ. App. 1970). Such a third party could also be liable to the trust beneficiaries for damages for breach of trust. *See* G.G. BOGERT & G.T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 901, at 304 (2d ed. rev. 1995); *see also* RESTATEMENT (SECOND) OF TRUSTS, *supra* § 321 (1959). At common law, a third party, who knew or should have known that he was dealing with a trustee, had a duty to inquire into whether the trustee had the power to engage in the transaction in question *and* was charged with knowledge of the proper construction of the trust terms. *See* Wendel, *The Evolution of the Law of Trustee's Powers and Third Party Liability for Participating in a Breach of Trust: An Economic Analysis*, 35 SETON HALL L. REV. 971, 977 n. 49 (2005); RESTATEMENT (SECOND) OF TRUSTS, *supra* § 297.

 New Hampshire departed from the common law in 1969 when it adopted the Uniform Trustees' Powers Act (UTPA). *See* Laws 1969, 312:1. Unlike the common law, the UTPA protected a third party dealing with a trustee unless the third party possessed *actual knowledge* that the trustee was exceeding or improperly exercising the trustee's powers. *See* Wendel,

*supra* at 973, 987. The UTPA "abolish[ed]" the "common law broad duty of inquiry," *id.* at 973, and granted "a third party who deal[t] with a trustee complete protection from liability unless the third party ha[d] *actual knowledge,* at the time of the transaction, that the proposed transaction constitute[d] a breach of trust," *id.* at 987. While the common law "placed third party purchasers of trust property on constructive or inquiry notice of possible breaches of trust," the UTPA gave "such purchasers protected bona fide status except where they [had] *actual knowledge* of a breach." *Adler v. Manor Healthcare Corp.*, 9 Cal. Rptr. 2d 732, 735 (Ct. App. 1992).

■ "The actual knowledge standard of liability allocate[d] virtually all of the risk of harm associated with a breach of trust to the settlor and trust beneficiaries, thereby creating an incentive for them to take precautions to minimize the risk of a breach." Wendel, *supra* at 973. "The official reporter for the UTPA acknowledged the broad protection the UTPA accorded third parties who dealt with a trustee." *Id.* at 987. According to the official reporter, under the UTPA:

> mere suspicion that limitations exist[ed] or knowledge of facts which, if pursued, would show that limitations exist[ed] [did] not deprive a person of this protection. The remedy for breach [was] limited to the trustee and a third party with actual knowledge that the trustee [was] exceeding his powers or improperly exercising them.

*Id.* (quotation and ellipsis omitted).

The New Hampshire statute expressing this part of the UTPA was RSA 564-A:7, I, which provided:

> With respect to a third person dealing with a trustee or assisting a trustee in the conduct of a transaction, the existence of trust powers and their exercise by the trustee may be assumed without inquiry. The third person is not bound to inquire whether the trustee has power to act or is properly exercising the power, and a third person, without actual knowledge that the trustee is exceeding his powers or improperly exercising them, is fully protected in dealing with the trustee as if the trustee possessed and properly exercised the powers he purports to exercise. A third person is not bound to assure the proper application of trust assets paid or delivered to the trustee.

RSA 564-A:7, I, was in effect during the relevant times in this appeal and, therefore, governs. Thus, to the extent that the Trust argues that Smith's

constructive knowledge of Donahue's breach of trust was sufficient to void the contracts, we disagree. Pursuant to RSA 564-A:7, I, Smith's actual knowledge was required.

## B

We next examine whether there is evidentiary support for the trial court's implicit finding that Smith lacked the requisite actual knowledge to void his contracts with Donahue. *See Frost v. Stevens*, 88 N.H. 164, 165-66 (1936) (whether party has actual knowledge is question of fact); *Clark v. Railroad*, 87 N.H. 36, 40 (1934). Although the trial court did not expressly make this finding, we assume it made all subsidiary findings necessary to support its decision. *See Nordic Inn Condo. Owners' Assoc. v. Ventullo*, 151 N.H. 571, 586 (2004). Also, for the purposes of this discussion, we assume, without deciding, that Donahue breached the trust either by entering into the 1996 agreement without Runyon's authorization or by using the money for his own purposes. Based upon our review of the record, we conclude that it supports the trial court's implied finding that Smith lacked the requisite actual knowledge.

With respect to whether Smith actually knew that Donahue breached the trust by entering into the 1996 agreement without his co-trustee's authorization, there is scant evidence that Smith even knew then that Runyon was a co-trustee. Although Donahue testified that he believed that Smith knew this, he clarified that this was only his assumption. Smith testified that, in fact, he did not learn until the 2000 allonge that Runyon had previously been Donahue's co-trustee.

Moreover, while the evidence supports a finding that Smith knew that Donahue used some of Smith's money for his own purposes, it does not compel a finding that Smith knew that, by so doing, Donahue violated the terms of the Trust. Smith testified that he knew in 1996 that Donahue was a trustee and that the property at issue was owned by the Trust. When he entered into the 2000 allonge, he also knew that the property at issue was held in trust for the benefit of Donahue's mother, Lillian. Smith did not know, however, whether Donahue allocated any of his own resources to the Trust, how much money, if any, he gave to the Trust, and how much money he spent for his own purposes.

According to Smith and other witnesses, he paid the money due under the 1996 agreement and 2000 allonge through his then-girlfriend and bookkeeper, Judith Mason. The payments were not made according to the schedules in the agreements, but were made whenever Donahue told Smith that he needed money. For some of these transactions, Mason kept notations indicating the purpose for which Donahue said he needed money. These notations showed that Donahue asked for money to travel to New

Zealand and Montana, among other things. Smith acknowledged that Donahue sometimes told him of the purpose for the money. Specifically, Smith testified that Donahue told him at one time that he was using some of the money to pay his daughter's tuition to attend a private school.

■ This evidence, however, does not compel a finding that Smith actually knew that Donahue violated the terms of the Trust by spending the money for his own purposes, rather than to benefit his mother, Lillian. There is no evidence that Smith actually knew the terms of the Trust documents. *See Farmers State Bank of Yuma v. Harmon*, 778 F.2d 543, 546-47 (10th Cir. 1985) (third party could not claim that it lacked "actual knowledge" that trustee exceeded powers where third party saw copy of trust instrument). Nor is there any evidence that Smith actually knew that Lillian was the *only* beneficiary during her lifetime. For all Smith knew, Donahue was also a trust beneficiary, and/or the trust document expressly allowed trustees to engage in self-dealing. We hold, therefore, that the evidence before the trial court did not compel a finding that Smith actually knew that Donahue committed a breach of trust either by entering into the 1996 agreement without his co-trustee's consent or by spending the money for his own purposes.

We acknowledge that the evidence may have supported a finding that Smith had constructive knowledge that Donahue breached the trust because he knew that Donahue was using at least some of the money for his own purposes. *See* RESTATEMENT (SECOND) OF TRUSTS, *supra* § 297 cmt. m ("[I]n a transaction known to the transferee to be for the benefit of the transferor personally, the transferee is chargeable with notice that the transfer is in breach of trust."). As previously discussed, however, constructive knowledge was insufficient under RSA 564-A:7, I. Actual knowledge was required, and the evidence does not mandate a finding that Smith had the necessary actual knowledge.

## II

Alternatively, the Trust argues that notwithstanding Smith's lack of actual knowledge, he is not entitled to specific performance under RESTATEMENT (SECOND) OF TRUSTS, *supra* § 310, which provides: "[I]f the trustee in breach of trust makes a contract to sell, mortgage or otherwise dispose of trust property to a third person, the third person cannot compel specific performance of the contract, even though he had no notice of the trust at the time when the contract was made and paid value before receiving such notice."

■ Comment (a) to this section makes clear that this provision applies only when the *transfer itself* would be a breach of trust:

> Although a person to whom trust property has been transferred in breach of trust takes it free of the trust if he paid value and had no notice of the breach of trust when the property was transferred to him . . . , a court of equity will not compel the trustee to transfer the property if such a transfer would be in breach of trust, unless the beneficiary of the trust was estopped by his words or conduct . . . . A court of equity will not compel a trustee to commit or complete the commission of a breach of trust.

RESTATEMENT (SECOND) OF TRUSTS, *supra* § 310 cmt. a; *see Hocking v. Hocking*, 484 N.E.2d 406, 410-11 (Ill. Ct. App. 1985). We hold that the Trust is not entitled to relief under this provision because it was superseded by the UTPA.

RESTATEMENT (SECOND) OF TRUSTS, *supra* § 310 could not have coexisted with the UTPA. Under the UTPA, as previously discussed, a third party, who lacked "actual knowledge that a trustee [was] exceeding his powers or improperly exercising them, [was] fully protected in dealing with the trustee as if the trustee possessed and properly exercised the powers he purport[ed] to exercise." RSA 564-A:7, I. A third party could not have been "fully protected" if he was unable to receive the benefit of his bargain by obtaining specific performance even though he lacked the requisite actual knowledge.

We acknowledge that in 2004, the legislature enacted the Uniform Trust Code, *see* RSA ch. 564-B (2007), and repealed RSA 564-A:7, I. *See* Laws 2004, 130:1; *see also* N.H.H.R. JOUR. 377 (2004). Under RSA 564-B:10-1012 (2007), "[a] person other than a beneficiary . . . who in good faith and for value deals with a trustee, without knowledge that the trustee is exceeding or improperly exercising the trustee's powers is protected from liability as if the trustee properly exercised the power." Pursuant to RSA 564-B:1-104 (2007), "a person has knowledge of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, has reason to know it." We express no opinion as to whether RESTATEMENT (SECOND) OF TRUSTS, *supra* § 310 is consistent with the Uniform Trust Code.

### III

■ Finally, the Trust argues that awarding specific performance in this case was inequitable because Smith comes to court with "unclean hands." To support this argument, the Trust relies upon its previous assertions regarding Smith's purported actual knowledge of Donahue's breach of

trust. As the evidence does not compel a finding that Smith had the requisite actual knowledge, the Trust's claim of "unclean hands" fails.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.