9th Circuit -- Manchester Family Division
No. 2011-701

## IN THE MATTER OF SUSAN J. REGAN AND STEVEN S. REGAN

Argued: April 11, 2012
Opinion Issued: July 18, 2012

*Hamblett & Kerrigan, P.A.*, of Nashua (*Andrew J. Piela* on the brief and orally), for the petitioner.

*Gawryl MacAllister & O'Connor*, of Nashua (*Jared O'Connor* on the brief and orally), for the respondent.

DALIANIS, C.J. The respondent, Steven S. Regan (father), appeals an order recommended by a Marital Master (*Lemire*, M.) and approved by the 9th Circuit — Manchester Family Division (*Emery*, J.) that, among other things: (1) declined to modify his obligations to carry life insurance and pay half of his minor daughter's uninsured medical expenses even though paying these amounts reduced his monthly income below the statutory self-support reserve, *see* RSA 458-C:3, IV(b) (2004); and (2) required him to exchange custody of his daughter at a police station, rather than at the parties' homes. We affirm in part, reverse in part, and remand.

The record contains the following facts. The father and the petitioner, Susan J. Regan (mother), have been divorced since 2008. They have four

daughters. When the parties divorced, they agreed in a permanent stipulation that each would carry life insurance for their children's benefit. Their uniform support order also required each to pay half of the children's uninsured medical expenses.

In March 2011, the mother moved to modify the parties' parenting plan. Among other things, she requested that exchanges of custody occur at a police station, arguing that this arrangement would resolve misunderstandings that had complicated exchanges.

The father objected and also moved to reduce his child support obligation. He alleged that, since the divorce, his base pay (subject to the possibility of commissions) had dropped from $30,000 per year to $24,000 per year. As a result of this decrease, he argued that he was unable to pay: (1) his full child support obligation; (2) life insurance premiums; and (3) his half of orthodontic expenses that the couple expected to incur on behalf of their youngest child.

The trial court found that the father's reduction in income constituted a "substantial change of circumstances" and it recalculated his child support obligation using the child support guidelines. RSA 458-C:7, I(a) (Supp. 2011); see RSA ch. 458-C (Supp. 2011). Based upon the number of children to be supported and the ratio of the father's gross income to the mother's, the trial court found that the father's new support obligation should have been $359.13 per month. Payment of this amount, however, would have reduced the father's income below the statutory self-support reserve, in violation of RSA 458-C:3, IV(b). Thus, to comply with the statute, the court reduced the father's monthly child support obligation by $3.13, which allowed him to retain a monthly base income equal to the $1,044 self-support reserve.

Although the court found that the father's reduction in income required reducing his child support obligation, it found "no basis to modify" the father's obligation to pay for half of his daughter's orthodontic expenses, and similarly declined to reduce the amount of life insurance he was obliged to carry. The court also granted the mother's motion that future custody exchanges take place at a police station. After unsuccessfully moving for reconsideration, the father appealed.

On appeal, we will affirm the findings and rulings of the trial court unless they are unsupported by the evidence or legally erroneous. *In the Matter of Cole & Ford*, 156 N.H. 609, 610 (2007). We will set aside a modification order only if it clearly appears from the evidence that the trial court's exercise of discretion was unsustainable. *Id.*

*I. Effect of Statutory Self-Support Reserve*

In arguing that the trial court erred by declining to modify his obligation to pay half of the children's uninsured medical expenses and maintain life insurance for their benefit, the father relies primarily upon the self-support reserve statute. *See* RSA 458-C:3, IV(b). That statute forbids imposing child support obligations that reduce a parent's income below a statutory self-support reserve. *See id.* The father argues that the trial court either violated RSA 458-C:3, IV(b) by ordering him to pay additional amounts for insurance and orthodontic treatment, or, alternatively, that its order constitutes an unsustainable exercise of discretion given his limited income.

To address these arguments, we must construe RSA 458-C:3, IV(b) and other relevant portions of the child support guidelines. We are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. *In the Matter of Coderre & Coderre*, 148 N.H. 401, 403 (2002). We interpret legislative intent from the statute as written, and, therefore, we will not consider what the legislature might have said or add words that the legislature did not include. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.* Addressing the parties' arguments also requires us to interpret their permanent stipulation approved and ordered in their divorce decree. In interpreting the meaning of a divorce decree, we review the decree *de novo*. *In the Matter of Georgakilas & Georgakilas*, 157 N.H. 662, 664 (2008). We consider the intent of the parties as expressed in the language of the stipulation. *Id.*

Under RSA 458-C:3, IV(b):

> If the obligor parent's gross income is greater than the self-support reserve but payment of the order *as calculated under this chapter* would reduce the obligor parent's income below the self-support reserve, the obligor parent's share of the total support obligation shall be presumed to be the difference between the self-support reserve and that parent's adjusted gross income, but in any event shall be no less than [fifty dollars,] the amount of a minimum support order.

(Emphasis added.) *See* RSA 458-C:2, V (defining "[m]inimum support order").

The language "as calculated under this chapter" effectively limits the scope of the self-support reserve's protection to orders made pursuant to the child support guidelines in RSA chapter 458-C. RSA 458-C:3, IV(b). Thus, although income is a proper consideration for support orders not

governed by the child support guidelines, the self-support reserve's terms make clear that its bright-line limitations do not apply to such awards. *See, e.g.*, RSA 458:19, I(b) (2004) (making alimony available only when the obligor is able to "meet reasonable needs," but not establishing a specific minimum income that may not be used to pay alimony). Therefore, to the extent the father argues that RSA 458-C:3, IV(b) extends to "non-child support obligations," the statute's plain language forecloses his argument.

As a result, to determine whether preservation of the father's self-support reserve requires vacating the orders to pay orthodontic expenses and life insurance premiums, we must first determine whether these payments are calculated "under [the child support] chapter." RSA 458-C:3, IV(b). If the payments are child support, then the father's total child support obligation reduced his monthly income below the self-support reserve in violation of RSA 458-C:3, IV(b). If the payments are not child support, then RSA 458-C:3, IV(b), by its terms, does not govern them.

 We conclude that payments for "medical costs not covered by insurance" constitute child support for purposes of calculating the self-support reserve. RSA 458-C:2, IV-a; *see* RSA 458-C:3. Accordingly, we vacate the trial court's order requiring the father to pay orthodontic expenses because payment of such expenses would reduce his income below the self-support reserve in violation of RSA 458-C:3, IV(b). The parties agree, however, that payment of life insurance premiums does not constitute child support, and based upon the facts of this case, we uphold the trial court's order requiring the father to maintain life insurance for his daughters' benefit.

### A. Orthodontic Expenses

We turn first to the father's argument that ordering him to pay half of his daughter's anticipated orthodontic expenses violates the self-support reserve statute. In *In the Matter of Coderre & Coderre*, 148 N.H. at 404-05, we held that uninsured medical expenses, a category that the parties agree includes the orthodontic treatment at issue, are not part of the general obligation to provide child support under RSA chapter 458-C.

*Coderre* relied upon the absence of uninsured medical expenses from child support guideline calculations and a requirement in RSA 458:17, IX (2004) that the court make determinations and findings relative to uninsured medical expenses. *In the Matter of Coderre & Coderre*, 148 N.H. at 404. In 2005, the legislature recodified that statute as RSA 461-A:14, IX (Supp. 2011). *See* Laws 2005, 273:1, :20. Then in 2007, the legislature significantly amended both this statute and the child support guidelines generally. *See* Laws 2007, ch. 227.

The amendments create a new obligation, the "[m]edical support obligation," and govern its calculation, its treatment under the child support guidelines, and the manner in which expenditures are to be made. RSA 458-C:2, IV-a; *see* Laws 2007, ch. 227. " 'Medical support obligation' means the obligation of either or both parents to provide health insurance coverage for a dependent child and/or pay . . . for medical costs not covered by insurance, including payment for the cost of premiums, co-payments, and deductibles." RSA 458-C:2, IV-a. This amendment effectively brings "medical costs not covered by insurance," the very costs that *In the Matter of Coderre & Coderre*, 148 N.H. at 404, noted did not appear in RSA chapter 458-C, within that chapter.

Additional amendments to the child support guidelines govern the amount each parent should pay toward the medical support obligation. The presumptive amount of a "reasonable medical support obligation" is four percent of each parent's gross income. RSA 458-C:3, V. The court may order a different amount, however, "based on a written or a specific finding, made by the presiding officer on the record, that the presumptive amount would be unjust or inappropriate, using the criteria set forth in RSA 458-C:5." *Id.* RSA 458-C:5 is also the statute that governs changes to other child support obligations.

"Amounts actually paid" for the medical support obligation are deducted from the paying parent's gross income before applying certain provisions of the child support guidelines. RSA 458-C:2, I(e), :3, II(c). Although the overall value of this deduction varies depending upon whether the obligor or obligee parent makes the payment, the deduction necessarily reduces a parent's general child support obligation. *See* RSA 458-C:3.

Finally, amendments to RSA 461-A:14, IX, which previously required only "determination[s] and findings relative to health insurance and the payment of uninsured medical expenses," Laws 2005, 273:1, now set forth how courts should allocate the medical support obligation. If the court determines that private health insurance is available to the parties based upon the "reasonable medical support obligation" calculated under the child support guidelines, then the court "shall order the parent, or parents, to provide such insurance for the child." RSA 461-A:14, IX(b). If private health insurance is not available or accessible, as the statute defines those terms, "the court shall establish a cash medical support obligation . . . equal to the reasonable medical support obligation amount." RSA 461-A:14, IX(c). Once a parent obliged to pay cash support begins to provide insurance, however, that parent's cash obligation is suspended and does not accrue. *Id.* A final provision permits the court to order an "additional medical support

obligation . . . in excess of the reasonable medical support obligation amount, in such other circumstances, as the court deems appropriate." RSA 461-A:14, IX(e).

Thus, the statutes we interpreted in *In the Matter of Coderre & Coderre* have changed. As a result, we must review the new treatment of uninsured medical expenses in the child support guidelines and RSA 461-A:14, IX.

As an initial matter, we reject the mother's arguments that, based upon the 2005 recodification of one of the statutes we relied upon in *In the Matter of Coderre & Coderre*, 148 N.H. at 404, and the doctrine of repeal by implication, we must in some measure defer to *In the Matter of Coderre & Coderre*'s holding. As to the 2005 recodification, even if the legislature demonstrated some approval of *In the Matter of Coderre & Coderre* by recodifying a statute construed in the opinion, in 2007, two years after the recodification, the legislature comprehensively amended *all* of the statutes relevant to our holding in that case. Our task today is to determine the meaning of these amendments, not the legislature's opinion of our construction prior to them.

As to repeal by implication, that doctrine has no application in this case. Repeal by implication occurs when "the natural weight of all competent evidence demonstrates that the purpose of [a] [new] statute was to supersede [a] former statute," but the legislature nonetheless failed to expressly repeal the former statute. *Ingersoll v. Williams*, 118 N.H. 135, 138 (1978). Because repeal by implication is disfavored, "[i]f any reasonable construction of the two statutes taken together can be found," we will not hold that the former statute has been impliedly repealed. *Board of Selectmen v. Planning Bd.*, 118 N.H. 150, 152-53 (1978). Here, however, we are not obliged to seek a reasonable construction reconciling the amendments we construe today with our holding in *In the Matter of Coderre & Coderre*, because the statutes we construed in that case have all been amended. Thus, there exist only "new" statutes, and no "former" statute for us to find impliedly repealed. As a result, we now interpret the amendments without any deference to our holding in *In the Matter of Coderre & Coderre*.

The amendments demonstrate the legislature's intent to establish a comprehensive scheme to govern the payment of medical expenses for children of divorced parents. Under the previous regime, courts were required to make findings and determinations regarding insurance and uninsured expenses, *see* Laws 2005, 273:1, but lacked legislative direction as to how to do so. This stood in contrast to other child-related expenses, such as private school tuition, *see In the Matter of Barrett & Coyne*, 150 N.H. 520, 524 (2004), and extracurricular activity expenses, *see In the Matter of Coderre & Coderre*, 148 N.H. at 406, which were — and still are — governed

by the "complex scheme of definitions and formulae" in the child support guidelines. *In the Matter of Barrett & Coyne*, 150 N.H. at 524.

Thus, while a comprehensive statutory scheme governed awards of other child-related expenses, no statutory standard existed for determining how much a parent should pay for medical support of a child or the services to which parents should direct such payments. As a result, a parent whose child support obligation was calculated to the penny under the guidelines, was nonetheless subject to unlimited liability for uninsured medical costs. Moreover, a parent could pay several times the amount of his child support obligation for his children's uninsured medical expenses, and the payments would not affect his obligation to pay child support. *See In the Matter of Coderre & Coderre*, 148 N.H. at 405 (noting that "uninsured medical expenses can be expensive," and the guidelines provided no offset).

The legislature apparently created the "[m]edical support obligation" to bring the same uniformity and predictability that already existed in other aspects of child support to what could be termed "medical support." RSA 458-C:2, IV-a. Indeed, the legislature mirrored the child support regime throughout its medical support amendments. For example, the provision that dictates the presumptive amount a parent should pay for a child's medical support appears in the same statute as the general child support formula. *See* RSA 458-C:3. Similarly, the provision upon which a court must rely when deviating from the presumptive medical support amount is the same provision that governs adjustment of the general child support obligation. *See* RSA 458-C:3, V, :5. The amendments' substance also demonstrates the legislature's intent that they be comprehensive. Most obviously, the definition of the medical support obligation includes not only the obligation "to provide health insurance coverage," but also to pay for "medical costs not covered by insurance," suggesting that a broad range of medical expenses fall within the term. RSA 458-C:2, IV-a.

In short, the amendments' language and structure favor a comprehensive interpretation providing predictability in the payment of uninsured medical expenses. We, therefore, decline to construe the amendments to exclude certain uninsured medical expenses, like the orthodontic treatments at issue, from the medical support obligation. Instead, we conclude that, just as the child support obligation embraces a broad range of child-related expenses, such as extracurricular activities, *see In the Matter of Coderre & Coderre*, 148 N.H. at 406, so too the medical support obligation embraces a broad range of medical costs not covered by insurance.

The mother argues that the principle of *ejusdem generis*, which provides that "where specific words in a statute follow general ones, the general words are construed to embrace only objects similar in nature to those

enumerated by the specific words," requires excluding medical expenses unrelated to insurance from the medical support obligation. *State v. Beauchemin*, 161 N.H. 654, 658 (2011) (quotation omitted). She maintains that the specific words "premiums, co-payments, and deductibles," which follow the general words "medical cost not covered by insurance," all presuppose some insurance coverage. RSA 458-C:2, IV-a. Therefore, she construes the medical support obligation to include only insurance-related expenses. We disagree.

*Ejusdem generis* is "a constructionary crutch," not a "judicial ukase." *State v. Beckert*, 144 N.H. 315, 319 (1999) (quotations omitted). It is "neither final nor exclusive and is always subject to the qualification that general words will not be used in a restricted sense if the act as a whole demonstrates a different legislative purpose in view of the objectives to be obtained." *Id.* (quotation omitted). Here, the statutory scheme demonstrates an intent to comprehensively address medical expenses under the medical support obligation, and we decline to employ *ejusdem generis* to defeat that intent.

Moreover, construing the statute to exclude uninsured medical expenses other than co-payments and deductibles results in different treatment of essentially identical expenses, which we believe the legislature did not intend. For example, suppose two children require the same medical procedure. Both are insured, but under different policies. Under one policy, the deductible is more than the procedure costs. The other policy does not cover the procedure. Under both policies, to obtain the necessary treatment, one or both parents would shoulder the entire cost. But, under a construction limiting the medical support obligation to co-payments and deductibles, whether the parents could deduct the procedure's cost from their child support obligations turns upon the terms of their insurance policies rather than upon the nature of the expense. Indeed, the parent with the high-deductible insurance would reduce her overall child support obligation because the amount actually paid for the insurance deductible would entitle her to a deduction under the child support guidelines. *See* RSA 458-C:2, I(e), IV-a, :3, II(b). By contrast, the support obligation of the parent whose insurance simply did not cover the procedure would be unaffected. Thus, the mother's interpretation would treat two parents paying the same amount for the same procedure differently without any apparent justification.

The mother also argues that the interpretation we adopt today creates an absurd result because it will require recalculation of the child support obligation whenever children incur medical expenses. We disagree. A presumptively reasonable medical support obligation is four percent of

each parent's gross income. RSA 458-C:5. Regardless of any unexpected medical expenses, this amount — or a deviation from this amount established in accordance with RSA 458-C:3, V — ought to remain the same absent some modification. *See* RSA 458-C:7; *see also In the Matter of Zikmanis & Peabody,* 160 N.H. 82, 84 (2010) (modifying obligation to pay uninsured medical expenses governed by RSA 458-C:7). Thus, we reject the mother's argument that our construction of the statute will require continual recalculation of the child support obligation.

█ Finally, the mother argues that the Family Division's "Uniform Support Order" form provides a space for the court to allocate a percentage of uninsured medical expenses to each parent in addition to a space for the fixed medical support obligation. We are not bound, however, by the Family Division's forms and decline to alter our statutory interpretation of the child support guidelines in light of them.

For all of these reasons, we conclude that the statutory amendments permit deductions for uninsured medical expenses under the child support guidelines. As a result, payment of such expenses by the father would necessarily reduce his income below the self-support reserve. *See* RSA 458-C:3, IV(b). Therefore, the trial court's order, insofar as it required such payments, failed to comply with RSA 458-C:3, IV(b). Of course, if the legislature did not intend the amendments to have this effect, it is free to amend the relevant statutes. *See In re Alex C.,* 161 N.H. 231, 241 (2010).

*B. Life Insurance*

The father next argues that the trial court erred by declining to modify his obligation to carry life insurance for his children's benefit. The parties' court-approved permanent stipulation required each to maintain $800,000 in life insurance with their children as beneficiaries. The father requested that his required insurance coverage be reduced by $500,000, which would reduce his premium payments by $75 each month. He argues that, because his income has already been reduced to the self-support reserve, the trial court unsustainably exercised its discretion by declining to modify his obligation to carry life insurance.

As an initial matter, we need not address the mother's argument that the trial court lacked authority to modify the parties' stipulation. Instead, we assume without deciding that the trial court had discretion to make such a modification and focus· upon the father's argument that it unsustainably exercised its discretion by declining to do so.

The parties agree that their stipulated obligations to provide life insurance are not "child support," and, therefore, for reasons already discussed, we assume without deciding that the self-support reserve statute

does not govern these obligations. RSA 458-C:3, IV(b). The father argues, however, that the policy underlying the statute counsels against imposing additional non-child-support obligations once child support payments have reduced a parent's income to the self-support reserve.

Even if we assume that the trial court has an obligation to investigate an obligor's ability to pay when ordering payment of non-child-support expenses, the father's argument fails. Indeed, the trial court here did consider the father's ability to pay his insurance premiums and evidently concluded that the father could afford the $75 a month he sought to avoid. *See Smith v. Lillian V. Donahue Trust*, 157 N.H. 502, 508 (2008) (noting that we assume the trial court made "all subsidiary findings necessary to support its decision"). In its order, the trial court noted that the father had $170,000 in a retirement account and implied that the ratio between his monthly income and expenses required access to funds other than his reported income. Specifically, the trial court summarized the mother's argument that the father spent $6,000 per month but made only $2,000 and had "only a small credit card debt." There was also evidence that in addition to his base salary, the father's pay structure enabled him to earn commissions. Given the father's ability to maintain a $4,000 budget shortfall each month, the trial court could reasonably have concluded that he had assets supplementing his gross income. We assume, based upon the trial court's finding that the father's monthly income was reduced to the self-support reserve, that it did not conclude that he had additional income. As a result, the trial court sustainably exercised its discretion in finding that a $75 monthly insurance payment would not unduly burden the father's ability to support himself.

To this analysis the father responds that, even if he possessed assets enabling him to sustain a budget well in excess of his monthly income, the trial court unsustainably exercised its discretion by considering these assets. He relies upon *In the Matter of Plaisted & Plaisted*, 149 N.H. 522, 525-26 (2003), in which we held that the child support guidelines prohibit a court from considering assets when awarding child support. The father argues that, because assets are an improper consideration when calculating child support, the court cannot consider assets when upholding a stipulation's non-child-support obligation. We disagree.

In *In the Matter of Plaisted & Plaisted*, 149 N.H. at 525, we noted that calculations under the child support guidelines are based upon income, not assets. We also explained that permitting a court to take assets into consideration when equitably adjusting support awards under RSA 458-C:5 could result in the liquidation of assets awarded in a property settlement. *In the Matter of Plaisted & Plaisted*, 149 N.H. at 526. This could effectively

transform child support into property division, thus circumventing the property division requirements. *See id.*; RSA 458:16-a (2004). In this way, both the plain language of the child support guidelines and the practical effect of child support adjustments based upon assets required us to conclude that assets are an improper consideration when awarding child support. *In the Matter of Plaisted & Plaisted*, 149 N.H. at 526.

None of these concerns applies here. First, the parties agree that their stipulation to provide life insurance is not child support; therefore, we have no reason to rely upon the plain language of the child support guidelines as we did in *In the Matter of Plaisted & Plaisted*. Moreover, while the statutory schemes that we interpreted in *In the Matter of Plaisted & Plaisted*, 149 N.H. at 525-26, evinced a plain intent to separate child support from property division, the parties' stipulation does no such thing. Indeed, nothing in the portion of the stipulation provided in the record suggests that the parties intended to exclude their assets as a source of life insurance payments. Therefore, we do not apply the reasoning of *In the Matter of Plaisted & Plaisted* to this case.

The father next argues that an agreement to provide life insurance "is ordinarily intended to act as security for an obligor's expected future stream of support payments." He contends that the $800,000 in insurance coverage he is obliged to carry is more than ten times the total child support he will pay by the time his children reach majority. He argues that, given his reduction in base pay, requiring him to continue carrying this amount of insurance constitutes an unsustainable exercise of discretion.

Although some courts analyze an order to carry life insurance as a permissible method to secure child support payments after the obligor's death, *see Bosem v. Bosem*, 279 So. 2d 863, 865-66 (Fla. 1973), the relevant inquiry here is not whether this is a permissible purpose for such an obligation, but whether it was the parties' actual purpose. *See In the Matter of Georgakilas & Georgakilas*, 157 N.H. at 664. The stipulation makes no reference to life insurance constituting security for child support and we decline to read such a construction into the stipulation. It does, however, expressly state that the life insurance is for the benefit of the minor children. Thus, the parties' agreement makes clear that both parties are to provide $800,000 in life insurance during the children's minority. Under these circumstances, we do not conclude that the trial court unsustainably exercised its discretion in not relieving the father from this obligation.

Finally, the father argues in his reply brief that the trial court had no authority to order him to use the assets in his retirement account to pay for life insurance because RSA 511:2, XIX (2010) exempts this account from attachment. This argument's obvious flaw is that the trial court never

attached the father's retirement account and, thus, did not violate RSA 511:2, XIX. Therefore, the trial court's consideration of the account when determining that the father could afford to provide life insurance was a sustainable exercise of discretion.

*II. Custody Exchanges*

The father next argues that the trial court unsustainably exercised its discretion by requiring the parties to exchange custody of their youngest daughter at a police station. When reviewing a trial court's decision on parenting rights and responsibilities, our role is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion. *In the Matter of Kurowski & Kurowski*, 161 N.H. 578, 585 (2011). We consider only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made, and we will not disturb the trial court's determination if it could reasonably have been made. *Id.*

The mother requested that the location of exchanges be changed in order to comply with the recommendation of a New Hampshire Division for Children, Youth and Families (DCYF) social worker. The social worker became involved with the family after the youngest daughter alleged that her mother had assaulted her following a custody exchange. An investigation revealed that the family had struggled with making timely exchanges and concluded that moving exchanges to the police station might mitigate this problem.

In finding that a new location for exchanges was in the daughter's best interest, the trial court found that "[f]or [the daughter] to continue to be subjected to conflict between the parties during exchanges is detrimental to her emotional well-being." The father argues that the record contained no evidence that there was conflict between the parties because the DCYF investigation related only to a conflict between the mother and the daughter. As a result, he argues that moving the exchanges to the police station was an unsustainable exercise of discretion.

Even if there was no "conflict between the parties" as the father contends, the record nonetheless supports the trial court's determination that making custody exchanges at a police station was in the daughter's best interest. The trial court noted that it had reviewed DCYF's report, which contained evidence of other conflicts surrounding custody exchanges. For example, the mother told the investigating social worker that, during the three years in which the couple had made exchanges at the father's home, the exchanges had never occurred on time. On one occasion, this tardiness caused an argument between the mother and her then-ten-year-

old daughter that culminated in a physical altercation. The trial court's conclusion that a more structured environment might end the tensions that apparently surrounded frequent late exchanges — and, therefore, would be in the daughter's best interest — was a sustainable exercise of discretion.

*Affirmed in part; reversed in part; and remanded.*

HICKS, CONBOY and LYNN, JJ., concurred.