Carroll
No. 2009-097

### THE LLK TRUST, THOMAS R. WALKER, TRUSTEE

v.

### TOWN OF WOLFEBORO

Argued: November 17, 2009
Opinion Issued: February 11, 2010

*Walker & Varney P.C.*, of Wolfeboro (*Thomas R. Walker* on the brief and orally), for the petitioner.

*Preti, Flaherty, Beliveau & Pachios, PLLP*, of Concord (*Mark H. Puffer* on the brief and orally), for the respondent.

CONBOY, J. The petitioner, The LLK Trust, Thomas R. Walker, trustee, appeals an order of the Superior Court (*Fauver*, J.) denying its request for an abatement from property taxes assessed by the respondent, Town of Wolfeboro. We affirm.

The record evidences the following facts. The petitioner owns property in Wolfeboro consisting of a residence with an attached barn and ninety-three acres of land, including 1,100 feet of frontage on Lake Wentworth. Approximately ninety-one and one-half acres of the property, including nearly the entire lake frontage, has been in current use since 1980. The house and barn are located in the middle of the property on one and one-half acres that are not in current use. Another acre, which is also not in current use, comprises the road leading to the house site, and the road from the house site to both the waterfront and the dock site.

In January 2006, when the petitioner purchased the property for $4,600,000, its total assessed value was $362,151. The assessed value of the one acre on which the house alone sits (the house site) was $104,500. In August 2006, the Town increased the property's total assessed value from $362,151 to $3,342,151. The assessment increased because the Town reclassified the house site from "shorefront residential" to "waterfront estate." Reclassifying the house site caused its assessment to increase from $104,500 to $2,979,500. The petitioner's July 2006 tax bill, based upon the property's total assessed value of $362,151, was $1,987; its December 2006 bill, based upon the property's total assessed value of $3,342,151, was $37,651.

Because it is undisputed, we assume that the petitioner timely applied to the Town for an abatement of the 2006 property tax due on the house site, and timely appealed the Town's denial to the superior court. *See LSP Assoc. v. Town of Gilford*, 142 N.H. 369, 371 (1997). At trial, the Town conceded that it should not have reclassified the house site. The Town argued that even if the house site remained classified as "shorefront residential," the Town had undervalued it significantly. The Town contended that the proper valuation of the house site for tax year 2006 should have been $1,214,351.

Based upon the testimony of the Town's assessor, the trial court concluded that the Town's new valuation of the house site was consistent with its fair market value, which the trial court found was $1,275,000 as of April 1, 2006. Accordingly, the trial court ruled that the petitioner had failed to prove by a preponderance of the evidence that, using the new assessed value of $1,214,351, the Town had taxed the house site disproportionately. This appeal followed.

■ The petitioner first argues that the trial court erred by upholding the Town's decision to change the house site's assessment in August 2006. The petitioner claims that the Town lacked authority to do this. "Because the power to tax arises solely by statute, the right to tax must be found within the letter of the law and is not to be extended by implication." *Pheasant Lane Realty Trust v. City of Nashua*, 143 N.H. 140, 143 (1998) (quotation and citations omitted). "As such, mistaken property tax valuations can be corrected only through legislatively authorized remedies." *Id.* Thus, resolving the petitioner's appeal requires us to construe the pertinent statutes.

The interpretation of a statute is a question of law, which we review *de novo*. *Zorn v. Demetri*, 158 N.H. 437, 438 (2009). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. *Id.* Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. *Id.* at 438-39. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.* at 439.

Pursuant to RSA 76:2 (2003), a tax year runs from April 1 to March 31. Taxes are assessed based upon the value of property located in a town as of April 1. *See* RSA 74:1 (Supp. 2009) (selectmen of each town must "take an inventory of all estate liable to be taxed in such town as of April 1"); *White v. Lee*, 124 N.H. 69, 76 (1983) ("Assessment of the tax is performed annually by each city and town, based upon their property inventory as of April 1."). The Town must adjust assessments annually "so that all assessments are reasonably proportional within that municipality." RSA 75:8, I (Supp. 2009). Additionally, "[a]t least as often as every fifth year, . . . the assessors and/or selectmen shall value all real estate within a municipality so that the assessments are valued in accordance with RSA 75:1." RSA 75:8-a (2003).

The Town collects taxes semi-annually pursuant to RSA 76:15-a (2003), which allows a town to collect taxes "assessed on April 1" in two installments, the first due on July 1, and the second on December 1. Bills for the July 1 installment must be mailed by June 15. RSA 76:15-a, II. In order for the bills to be prepared, "the lists of assessed property shall be committed by the selectmen with a warrant under their hands and seal directed to the collector of such town no later than May 15." *Id.* The first installment may be based upon "the prior year's assessed valuation times 1/2 of the previous year's tax rate." RSA 76:15-a, I. If, however, "it shall appear to the selectmen or assessors that certain individual properties have physically changed in valuation, they may use the current year's appraisal times 1/2 the previous year's tax rate to compute the partial payment." *Id.* Upon receipt of the July payment, the tax collector must credit it "toward the amount of the taxes eventually assessed against the property." RSA 76:15-a, II. "A payment of the remainder of the taxes assessed April 1, minus the payment due on July 1 of that year, shall be due and payable December 1." *Id.*

The trial court did not issue a specific finding as to whether the Town erred when it revised its assessment of the house site in August 2006. "Although the trial court did not expressly make this finding, we assume it made all subsidiary findings necessary to support its decision." *Smith v. Lillian V. Donahue Trust*, 157 N.H. 502, 508 (2008). "We sustain the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law." *Tennessee Gas Pipeline Co. v. Town of Hudson*, 145 N.H. 598, 600 (2000) (quotation omitted). The record supports a finding that the Town did not violate the statutory scheme described above by revising the assessment in August.

■ As allowed under RSA 76:15-a, the record shows that the Town based the petitioner's July 1, 2006 semi-annual tax bill upon the prior year's assessment of $362,151. The petitioner's December 1, 2006 semi-annual tax bill was based upon the property's assessment as of April 1, 2006. As the Town's current assessor explained:

A. [T]he second tax bill [is] the actual tax bill of the year, which is . . . after the State sets the tax rate and the second bill is your legal bill of the year. . . .

. . . .

A. The first tax bill is only an appropriation for money for the Town. . . . [W]hatever we do — we're looking at April 1st as the tax date, so let's say if you're building a new house . . . [we look at]

[w]here were you as of April 1st? It may not be changed on the tax card until September or . . . August . . . or some time after . . . that first tax bill went out. But it still reflects what was happening . . . on April 1st of . . . that year.

The record does not support the petitioner's contention that the Town twice assessed the value of the house site as of April 1, 2006. Contrary to the petitioner's assertions, the assessment reflected on the January and June 2006 tax cards is from the *prior* year; the assessment reflected on the September 2006 tax card was the property's assessed value as of April 1, 2006. Although the petitioner also contests the Town's decision to reclassify the house site from "shorefront residential" to "waterfront estate," this argument is moot given the Town's concession that reclassifying the property was error.

To the extent that the petitioner contests the Town's assessment of other property that is not in current use, we observe that the trial court found that the only assessment in dispute concerned the house site. The petitioner's tax abatement petition confirms that the petitioner's appeal to the superior court was limited to this assessment. As the petitioner has failed to argue that the trial court's finding in this regard was erroneous, we decline to address the validity of any other assessment.

The petitioner next argues that the trial court erred when it concluded that the value of the house site is enhanced by the fact that it is surrounded by current use land. He contends that this court, in reviewing the trial court's order, should "disregard any enhancement factors regarding the valuation" of the house site. However, the petitioner's *own* experts testified that such enhancement was proper. One of the petitioner's experts testified:

Q. What's the benefit that's derived from a piece of property in your opinion that is not in current use, but [is] surrounded by land like this place?

A. Okay. It's not substantial. I would say it's about five percent.

This expert also testified that in choosing sale properties to which to compare the petitioner's property, she "wanted to acknowledge that" because of the current use land "the home site had privacy and control over that privacy." The petitioner's other expert also testified that the fact that the house site was surrounded by current use land "boost[ed]" the value of the house site by five percent.

Moreover, the other experts testifying at trial *agreed* that the fact that the house site is surrounded by current use land enhanced its value. The Town's previous assessor, Alice McKinnon, who had set the prior year's assessment at $104,500, testified that "the house lot would be worth

more . . . with the current use land around it." She testified that if the house lot "were located somewhere else and . . . wasn't surrounded by land in current use, it would have been valued at $40,000," but that because it was surrounded by current use land, she "enhanced that value by more than two . . . and a half times." Additionally, the Town's expert testified that it would be proper to enhance the value of the house site because it is surrounded by current use land, although he did not testify that he used such an enhancement in his appraisal.

■ Given this factual record, we conclude that the petitioner has not demonstrated that it preserved for our review the question of whether, as a matter of law, it is proper to enhance the value of land that is not in current use because it is surrounded by current use land. Not only did the petitioner fail to object to testimony that enhancing the value of the house site was proper, the petitioner was, in fact, the *proponent* of such testimony. Under these circumstances, we conclude that the issue is not preserved for our review, and we decline to address it. *See State v. Pepin*, 156 N.H. 269, 279-80 (2008).

Alternatively, the petitioner asserts that we should allow only privacy and location to enhance the value of land surrounded by current use land and should not allow "passive recreational uses" to enhance the value. As there is no evidence in the record submitted on appeal that the appraisal by the Town's expert, upon which the trial court relied, enhanced the value of the house site for this reason, we similarly decline to address this argument.

■ The petitioner next contends that the trial court erred by adopting the opinion of the Town's expert because his methodology was flawed. The petitioner's assertions in this regard concern the proper weight to be accorded the testimony of the Town's expert. However, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. *Syncom Indus. v. Wood*, 155 N.H. 73, 86 (2007). To the extent that the petitioner argues that it met its burden of proving disproportionality solely by showing that the methodology used by the Town's expert was flawed, we disagree. "[D]isproportionality, and not methodology, is the linchpin in establishing entitlement to a petition for abatement." *Verizon New England v. City of Rochester*, 151 N.H. 263, 272 (2004); *see Porter v. Town of Sanbornton*, 150 N.H. 363, 369 (2003). "[W]hile it is possible that a flawed methodology may lead to a disproportionate tax burden, the flawed methodology does not, in and of itself, prove the disproportionate result." *Verizon New England*, 151 N.H. at 272.

█ The petitioner next asserts that the trial court erred by accepting the assessment offered by the Town's expert and rejecting that offered by other experts. When faced with conflicting testimony, a trier of fact is free to accept or reject an expert's testimony, in whole or in part. *Tzimas v. Coiffures by Michael*, 135 N.H. 498, 501 (1992). Accordingly, we find no error in the trial court's decision to credit the opinion of one expert over the opinions of other experts.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.