NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Utilities Commission
No. 2017-0007


APPEAL OF ALGONQUIN GAS TRANSMISSION, LLC
APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE d/b/a
EVERSOURCE ENERGY
(New Hampshire Public Utilities Commission)

Argued: September 27, 2017
Opinion Issued: May 22, 2018

Robinson & Cole LLP, of Hartford, Connecticut and Providence, Rhode Island (Joey Lee Miranda and Dana M. Horton on the brief), and Jennifer R. Rinker, of Houston, Texas, by brief, for appellant Algonquin Gas Transmission, LLC.

McLane Middleton, Professional Association, of Manchester (Wilbur A. Glahn, III on the brief and orally), and Robert A. Bersak and Matthew J. Fossum, of Manchester, by brief, for appellant Public Service Company of New Hampshire d/b/a Eversource Energy.

Orr & Reno, P.A., of Concord (Douglas L. Patch on the brief and orally), for appellee NextEra Energy Resources, LLC.

Thomas F. Irwin, of Concord, by brief, for appellee Conservation Law Foundation.

D. Maurice Kreis, consumer advocate, by brief and orally, for appellee Office of the Consumer Advocate.

Robert Backus, Burt Cohen, Richard Russman, and Clifton Below, self-represented parties, by brief, as amicus curiae.

LYNN, C.J. The appellants, Algonquin Gas Transmission, LLC (Algonquin) and Public Service Company of New Hampshire d/b/a Eversource Energy (Eversource), appeal an order of the New Hampshire Public Utilities Commission (PUC) dismissing Eversource's petition for approval of a proposed contract for natural gas capacity, as well as a program to set parameters for the release of capacity and the sale of liquefied natural gas made available to electric generators, and/or an associated tariff. The appellees, NextEra Energy Resources, LLC (NextEra), Conservation Law Foundation (CLF), and the Office of the Consumer Advocate (OCA), appear in opposition to this appeal. We reverse and remand.

I

The following facts are supported by the record. Eversource is a public utility company operating under New Hampshire law as an electric distribution company (EDC). Algonquin is an owner-operator of a gas pipeline located in New England.

In April 2015, the PUC issued an Order of Notice announcing an investigation "into potential approaches involving New Hampshire's [EDCs] to address cost and price volatility issues currently affecting wholesale electricity markets in New Hampshire." As background, the PUC explained that in 1996 the legislature enacted RSA chapter 374-F, the electric utility restructuring chapter, with the "overall public policy goal" of developing "a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment." (Quoting RSA 374-F:1 (2009).) The PUC noted that over the two decades following the chapter's enactment, "competitive electricity markets have developed in New Hampshire, at both the wholesale and retail levels," and that, "[u]ntil recently,

2

market competition at the wholesale and retail levels has tended to keep electricity prices at reasonable levels for New Hampshire consumers."

The PUC observed, however, that the previous two years had "seen significant transitions in New Hampshire's wholesale and retail electricity markets, and those of the New England region generally," including "an increasing dependence on natural gas-fueled generation plants within the region . . . as aging coal, oil, and nuclear plants have been retired." According to the PUC, "[d]uring recent winters, significant constraints on natural gas resources have emerged in New England, despite abundant natural gas commodity production in the Mid-Atlantic States and elsewhere," leading to "extreme price volatility in gas markets in the winter months in our region, which, in turn, have resulted in sharply higher wholesale electricity prices." The PUC stated that, "[o]verall, the average retail price of electricity in New England is the highest in the continental United States, posing a threat to our region's economic competitiveness."

Recognizing that it has "a fundamental duty to ensure that the rates and charges assessed by EDCs are just and reasonable," the PUC acknowledged that "the potential development of additional natural gas resources for the benefit of the electricity supply in our region should be carefully considered," and that "[a] targeted Staff investigation to examine the gas-resource constraint problem that is affecting New Hampshire's EDCs and electricity consumers generally may yield potential solutions to these market issues." Accordingly, the PUC directed PUC Staff (Staff) to, among other things, "inquire with the EDCs . . . regarding potential means of addressing these market problems" and provide the PUC with a report no later than September 15, 2015.

In the context of that investigation, certain stakeholders asked whether RSA chapter 374-F prohibits EDCs from acquiring gas capacity. In response, Staff issued a memorandum on July 10, 2015, opining that the PUC

> may find that a proposal by an EDC to acquire incremental gas capacity, for the use of gas-fired generators, could enhance power system reliability (especially in winter when existing gas capacity is constrained), and thus help the EDC meet its duty to provide reliable service under RSA 374:1; provide public benefits related to the provision of electricity (e.g., less price volatility, enhanced winter reliability, etc.); and serve as an element of New England-wide cooperation to reduce gas capacity constraints in order to provide for the displacement of oil and coal-fired electric generation by cleaner gas-fired electric generation. If the [PUC] were to decide that these goals were congruent with various Restructuring Policy Principles [in RSA 374-F:3], and that these principles were not overridden by the single principle of generation-distribution

3

separation in RSA 374-F:3, III, it could conclude that RSA Chapter 374-F does not preclude such an EDC capacity purchase. Furthermore, an EDC making such a proposal could argue that provision of gas capacity to unaffiliated merchant generators does not violate the functional separation principle of RSA 374-F:3, III in the first instance, in that New Hampshire EDCs would not actually acquire the gas capacity for their own use, but rather, would make such capacity available for the use of merchant generators in a bilateral transaction.

On September 15, 2015, Staff issued a 49-page report on its investigation into potential approaches to mitigate wholesale electricity prices.[1] Staff reiterated that the policy principle in RSA 374:F-3, III (2009), that generation services should be "at least functionally separated from transmission and distribution services," RSA 374-F:3, III, should be read in concert with other restructuring policy principles set forth in the statute that are "of similar importance to the functional separation principle." In doing so, Staff concluded that the PUC "could rule, in response to a proposal being made by a New Hampshire EDC, that the potential benefits of a gas-capacity acquisition project would foster the overall goals of the Restructuring Policy Principles of RSA [chapter] 374-F," which include "cost savings for distribution customers of EDCs; enhanced reliability for New England's increasingly gas-dependent electric generation fleet and electric transmission system; and environmental benefits from the displacement of inefficient coal and oil generation units by highly efficient gas generation units." Staff noted "that quality evidence of such benefits will be of critical importance in gauging the appropriateness of a given proposal under RSA [chapter] 374-F."

In January 2016, the PUC accepted the Staff report "as compliant with the directives" it had set out. The PUC noted that, although the Staff report set forth Staff's view that "there exists a path under New Hampshire law for the approval of acquisitions of natural gas capacity resources by New Hampshire EDCs for the economic benefit of their customers and the customers of other regional EDCs," it was clear to the PUC "that no consensus exists regarding the potential legality of such an acquisition of gas capacity by a New Hampshire EDC" and the PUC expected "that such a capacity acquisition would be highly controversial."

---

[1] Staff noted that it had received responses to its July 10 memorandum from seven stakeholders presenting "a wide diversity of views" on the issue of the authority of EDCs "acquiring gas pipeline capacity for the ultimate use of gas generators." After reviewing those responses, "and having considered the matter further," Staff re-adopted the conclusions set forth in its July memorandum.

4

Accordingly, the PUC stated its intention "to rule on the question of whether a New Hampshire EDC has the legal authority to acquire natural gas capacity resources to positively impact electricity market conditions, only within the context of a full adjudicative proceeding . . . , and only in response to an actual (as opposed to hypothetical) petition." The PUC explained that, in such a circumstance, it would consider a petition "in separate phases." In the first phase, the PUC "would review briefs submitted by the petitioner EDC, Staff, and other parties regarding whether such capacity procurement is allowed under New Hampshire law." If the PUC were to rule against the legality of such a petition, the petition would be dismissed, but, if not, a second phase of the proceeding would take place "to examine the appropriate economic, engineering, environmental, cost recovery, and other factors presented by the actual proposal." In doing so, the PUC would allow "discovery, testimony, rebuttal testimony, and cross-examination."

In February 2016, Eversource petitioned the PUC "for approval of a Precedent Agreement for firm gas transportation and storage services between Eversource and Algonquin . . . relative to the proposed Access Northeast ('Access Northeast' or 'ANE') pipeline project (the 'ANE Contract')." Eversource requested the PUC's approval of: (1) "the ANE Contract, which is a 20-year interstate pipeline transportation and storage contract providing natural gas capacity for use by electric generation facilities"; (2) "an Electric Reliability Service Program . . . to set parameters for the release of capacity and the sale of liquefied natural gas . . . supply available by virtue of the ANE Contract"; and (3) "a Long-Term Gas Transportation and Storage Contract . . . tariff, which allows for recovery of costs associated with the ANE Contract."[2]

In March 2016, the PUC issued an Order of Notice of its receipt of Eversource's petition. The PUC noted that "[t]he filing raises, inter alia, issues related to whether" the contract "would violate the Restructuring Principles of RSA Chapter 374-F." Accordingly, the PUC opened the first phase of its proceeding to "review briefs submitted by Eversource, Staff and other parties regarding whether the Access Northeast Contract, and affiliated program elements, is allowed under New Hampshire law."

In October 2016, the PUC dismissed Eversource's petition, concluding as a matter of law that Eversource's proposal conflicted with the principles and requirements of RSA chapter 374-F. After reviewing the stated purposes of the statute set forth in RSA 374-F:1, I and II, and the so-called "functional separation" restructuring policy principle set forth in RSA 374-F:3, III, the PUC ruled that "the overriding purpose of the Restructuring Statute is to introduce

_____

[2] According to Eversource, the ANE pipeline project "is designed to provide increased natural gas deliverability to the New England region to support electric generation, including most directly, the gas-fired electric generating plants on the Algonquin and [Maritimes & Northeast Pipeline] systems."

competition to the generation of electricity," with the "long-term results [to] be lower prices and a more productive economy." It explained that "[t]o achieve that purpose, RSA 374-F:3, III directs the restructuring of the industry, separating generation activities from transmission and distribution activities, and unbundling the rates associated with each of the separate services." Thus, the PUC concluded that "the proposal brought forward by Eversource is fundamentally inconsistent with the purposes of restructuring." The PUC subsequently denied Eversource's and Algonquin's motions for reconsideration, and this appeal followed.

II

On appeal, Eversource argues that the PUC's determination that "the overriding purpose of the Restructuring Statute was to introduce competition to the generation of electricity" resulted from an interpretation of the statute that fails to "comport with the stated purpose of the law, ignores nearly all of the interdependent policy principles enumerated in it, and undermines the authority the Commission has been granted relative to the implementation of the law." (Quotation omitted.) According to Eversource, the PUC "was wrong as to both the expressed purpose of the law and in finding a mandate or directive for the separation of generation and transmission and distribution services within it." Because the PUC's order failed to properly construe RSA chapter 374-F and because that failure "colored the entire order," Eversource contends that it should be reversed. (Capitalization and bolding omitted.)

Algonquin agrees with Eversource that the PUC erred when it concluded that the fundamental purpose of RSA chapter 374-F is to encourage competition in the generation of electricity, arguing that this finding "directly contravenes the plain language of the Restructuring Statute, is inconsistent with its legislative history, and confuses the goals of the Restructuring Statute with the methods by which to achieve those goals." Algonquin asserts that the PUC's analysis "conflate[d] the <u>purpose</u> of the Restructuring Statute with the <u>methods</u> employed by the Restructuring Statute," and, in doing so, "leapt to the unsupported conclusion that the goal of the Restructuring Statute is competition for its own sake."

The parties that appear in opposition to this appeal disagree with Eversource and Algonquin. CLF argues that the PUC correctly interpreted RSA chapter 374-F to conclude that Eversource's proposal "would violate the Act's overriding purpose of establishing <u>competition</u> in the generation of electricity by separating electric generation from electric distribution and protecting ratepayers from generation-related risks." According to CLF, the PUC's interpretation of the statute "is owed deference, [and] is supported by the unambiguous language of the Act, including its purposes to restructure the industry to reduce costs for consumers 'by harnessing the power of competitive

markets,' RSA 374-F:1, I, and to serve the 'essential right of the people' to have '[f]ree and fair competition' and be 'protected against all monopolies and conspiracies which tend to hinder or destroy it.'" (Quoting N.H. CONST. pt. II, art. 83.) (Quotations omitted.)

OCA asserts that the PUC "did not . . . apply one of the policy principles to the inappropriate exclusion of others," nor did it "read too much into the Legislature's use of the word 'should' in the so-called functional separation principle." Rather, it contends, the PUC "kept faith with its instructions in the implementation section, RSA 374-F[:]4," that "the Legislature has declared that in its restructured state New Hampshire's electric industry now relies on the competitive market for everything related to generation."

Likewise, NextEra argues that "there would have been no electric utility restructuring . . . without the extraction of generation and subjecting it to the market" and, therefore, the PUC's "decision to dismiss the Eversource Petition because it violated the Separation and Unbundling Requirements is supported by the Commission's discernment that the overriding purpose of the Restructuring Statute was the introduction of generation to competition." Furthermore, NextEra asserts that "the fact that the Commission used its informed judgment to focus on the one interdependent policy principle most directly implicated, and cross-referenced in many of the other principles, was reasonable and consistent with the express language of the Restructuring Statute."

III

A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. RSA 541:13 (2007); see Appeal of Pennichuck Water Works, 160 N.H. 18, 26 (2010). Although we give the PUC's policy choices "considerable deference" in reviewing its decisions rendered on the merits, we do not defer to its statutory interpretation. Pennichuck, 160 N.H. at 26. Where, as here, the issue presented is purely a question of law, we review the PUC's statutory interpretation de novo. See id.; see also Appeal of Town of Seabrook, 163 N.H. 635, 644 (2012) (explaining that while an interpretation of a statute by the agency charged with its administration is entitled to some deference, we are still the final arbiter of the legislature's intent and are not bound by an agency's interpretation of a statute); Appeal of Bretton Woods Tel. Co., 164 N.H. 379, 386 (2012).[3]

---

[3] We note that no party suggests that the PUC's construction of the restructuring statute in the present case follows a consistent pattern by that agency of interpreting the statute in a similar fashion. Thus, this case does not present the situation wherein long-standing agency practice has placed an administrative gloss on an ambiguous statute that the legislature has not seen fit to alter. See Petition of Kalar, 162 N.H. 314, 321 (2011); DHB v. Town of Pembroke, 152 N.H. 314,

"In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." Roy v. Quality Pro Auto, 168 N.H. 517, 519 (2016) (quotation omitted). "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Id. (quotation omitted). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. LLK Trust v. Town of Wolfeboro, 159 N.H. 734, 736 (2010). We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. Id.

IV

The issue we address is a narrow one — whether the PUC erred when it determined as a matter of law that, on its face, "the proposal brought forward by Eversource is fundamentally inconsistent with the purposes of restructuring" and, thus, is prohibited under RSA chapter 374-F. In denying Eversource's petition, the PUC first ruled "that the overriding purpose of the Restructuring Statute is to introduce competition to the generation of electricity" with the "long-term results [to] be lower prices and a more productive economy." The PUC then further ruled that "[t]o achieve that purpose, RSA 374-F:3, III directs the restructuring of the industry, separating generation activities from transmission and distribution activities, and unbundling the rates associated with each of the separate services." (Emphasis added.) Given these rulings, the PUC concluded that "the basic premise of Eversource's proposal — having an EDC purchase long-term gas capacity to be used by electric generators — runs afoul of the Restructuring Statute's functional separation requirement." We disagree.

In 1996, the legislature found that "New Hampshire has the highest average electric rates in the nation and such rates are unreasonably high." Laws 1996, 129:1, I. These high electric rates, combined with the findings "that electric rates for most citizens may further increase" and "that there is a wide rate disparity in electric rates both within New Hampshire and as compared to the region," were found to have "a particularly adverse impact on New Hampshire citizens." Laws 1996, 129:1, I. The legislature further found that the effects of the state's "extraordinarily high electric rates disadvantage

---

321 (2005). The absence of this factor undermines the appellees' argument for deference to the PUC's construction of the statute.

all classes of customers," were "causing businesses to consider relocating or expanding out of state," and were "a significant impediment to economic growth and new job creation in this state." Laws 1996, 129:1, II. Accordingly, the legislature determined that "New Hampshire must aggressively pursue restructuring and increased consumer choice in order to provide electric service at lower and more competitive rates." Laws 1996, 129:1, III. To address these concerns, the legislature enacted RSA chapter 374-F. See RSA 374-F:1.

As set forth in the statute, "[t]he most compelling reason to restructure the New Hampshire electric utility industry is to reduce costs for all consumers of electricity by harnessing the power of competitive markets." RSA 374-F:1, I (emphasis added). "The overall public policy goal of restructuring is to develop a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment." Id. (emphasis added).

To that end, the statute identifies "interdependent policy principles" that "are intended to guide the New Hampshire public utilities commission in implementing a statewide electric utility industry restructuring plan, . . . and in regulating a restructured electric utility industry." RSA 374-F:1, III. These 15 "Restructuring Policy Principles" (policy principles) include: "System Reliability"; "Customer Choice"; "Regulation and Unbundling of Services and Rates"; "Open Access to Transmission and Distribution Facilities"; "Universal Service"; "Benefits for All Consumers"; "Full and Fair Competition"; "Environmental Improvement"; "Renewable Energy Resources"; "Energy Efficiency"; "Near Term Rate Relief"; "Recovery of Stranded Costs"; "Regionalism"; "Administrative Processes"; and "Timetable." RSA 374-F:3, I-XV (2009 & Supp. 2017) (bolding and capitalization omitted).

The specific policy principle at issue before us, the so-called "functional separation" principle, provides in pertinent part:

> III. Regulation and Unbundling of Services and Rates. When customer choice is introduced, services and rates should be unbundled to provide customers clear price information on the cost components of generation, transmission, distribution, and any other ancillary charges. Generation services should be subject to market competition and minimal economic regulation and at least functionally separated from transmission and distribution services which should remain regulated for the foreseeable future. However, distribution service companies should not be absolutely precluded from owning small scale distributed generation

9

resources as part of a strategy for minimizing transmission and distribution costs.

RSA 374-F:3, III (capitalization omitted). Algonquin and Eversource both argue that the proposed ANE Contract does not violate this provision of the statute because a gas contract for the purchase of capacity on a natural gas pipeline does not constitute "generation services." (Quotation omitted.) Eversource contends that it "is not proposing to combine any generation and distribution functions, nor is it proposing the ANE Contract as a means to engage in 'generation services' described in RSA 374-F:3, III," but, rather, "it is seeking to ensure long-term electric system reliability by supporting the delivery of adequate natural gas supplies to, among other end-users, the region's competitive gas-fired electric generators." Algonquin concurs that "Eversource's sole and critical role would be making primary firm natural gas capacity available—Eversource would not be providing or engaged in the generation of electricity." The appellees, on the other hand, contend that the purchase of gas capacity should be considered a component of electricity generation. We conclude that this issue cannot be decided as a matter of law, and, therefore, we decline to address it at this juncture.

However, even assuming that Eversource's proposal could be considered to involve generation, that would not end the inquiry. The chapter does not prioritize the 15 restructuring policy principles contained in section 3. Nor does the chapter reflect any legislative intent that the "functional separation" policy principle is meant to "direct" the PUC in the exercise of its authority in implementing the chapter to the exclusion of the 14 remaining principles. The policy principles are identified as being "interdependent." RSA 374-F:1, III. The common definition of "interdependent" is "mutually dependent." Webster's Third New International Dictionary 1177 (unabridged ed. 2002); see Woolf v. Fuller, 87 N.H 64, 68 (1934) (explaining that two provisions of law were "interdependent," meaning that "one qualif[ied] and limit[ed] the other; otherwise . . . due effect could not be given to both at the same time"). As Algonquin points out, the PUC's order "does not . . . discuss any of the other" policy principles, and, "by erroneously focusing on the Functional Separation Principle," the PUC did not consider whether "many, if not all, of the other fourteen [policy principles] would be advanced" by the proposed agreement.

Furthermore, RSA 374-F:3 expressly states when such policy principles establish directives to the PUC. See, e.g., RSA 374-F:3, I (2009) ("[r]eliable electricity service must be maintained" (emphasis added)); RSA 374-F:3, V(a) (2009) ("[a] utility providing distribution services must have an obligation to connect all customers in its service territory to the distribution system" (emphasis added)); RSA 374-F:3, V(c) (2009) ("[a]ny prudently incurred costs arising from compliance with the renewable portfolio standards . . . for default service or purchased power agreements shall be recovered through the default

10

service charge" (emphasis added)); RSA 374-F:3, XII(a) (2009) ("in addressing claims for stranded cost recovery and fulfilling its responsibility to determine rates which are equitable, appropriate, and balanced and in the public interest . . . , the [PUC] <u>shall</u> balance the interests of ratepayers and utilities during and after the restructuring process" (emphasis added)).

By contrast, other policy principles state only that the PUC "should" take certain factors into consideration, including that "[g]eneration services <u>should</u> be . . . at least functionally separated from transmission and distribution services," RSA 374-F:3, III. <u>See</u> <u>also</u>, <u>e.g.</u>, RSA 374-F:3, II (2009) ("[c]ustomers <u>should</u> be able to choose among options such as levels of service reliability, real time pricing, and generation sources" (emphasis added)); RSA 374-F:3, IV (2009) ("[n]on-discriminatory open access to the electric system for wholesale and retail transactions <u>should</u> be promoted" (emphasis added)); RSA 374-F:3, V(a) (2009) ("[e]lectric service is essential and <u>should</u> be available to all customers" and a "restructured electric utility industry <u>should</u> provide adequate safeguards to assure universal service" (emphasis added)); RSA 374-F:3, VII (2009) ("[t]he rules that govern market activity <u>should</u> apply to all buyers and sellers in a fair and consistent manner" (emphasis added)); RSA 374-F:3, VIII ("environmental protection and long term environmental sustainability <u>should</u> be encouraged" and "[i]ncreased competition in the electric industry <u>should</u> be implemented in a manner that supports and furthers the goals of environmental improvement" (emphasis added)); RSA 374-F:3, IX (2009) ("[i]ncreased future commitments to renewable energy resources <u>should</u> be consistent with the New Hampshire energy policy" and "<u>should</u> be balanced against the impact on generation prices" (emphasis added)); RSA 374-F:3, X (2009) ("[r]estructuring <u>should</u> be designed to reduce market barriers to investments in energy efficiency" (emphasis added)); RSA 374-F:3, XIII (2009) ("New Hampshire <u>should</u> work with other New England and northeastern states to accomplish the goals of restructuring" and "<u>should</u> assert maximum state authority over the entire electric industry restructuring process" (emphasis added)).

The use of the word "should" allows the PUC to exercise its discretion and judgment; in contrast, the word "shall" establishes a mandatory duty. <u>See</u> <u>Ford v. N.H. Dep't of Transp.</u>, 163 N.H. 284, 296 (2012); <u>Appeal of Psychiatric Institutes of America</u>, 132 N.H. 177, 183 (1989). Had the legislature intended to require the PUC to prioritize the "functional separation" policy principle above all other principles identified in the statute, and to require "functional separation" in all circumstances, it would have said so. "Where the legislature fails to include in a statute a provision for mandatory enforcement that it has incorporated in other, similar contexts, we presume that it did not intend the law to have that effect and will not judicially engraft such a term." <u>In the Matter of Bazemore & Jack</u>, 153 N.H. 351, 354 (2006); <u>see</u> <u>LLK Trust</u>, 159 N.H.

11

at 736 (stating that we "will not consider what the legislature might have said or add language that the legislature did not see fit to include").

Pursuant to its plain language, and reading the statute as a whole, we discern that the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers. See RSA 374-F:1, I. We disagree with the PUC's ruling that the legislature's "overriding purpose" was "to introduce competition to the generation of electricity." Rather, as the statute provides, the legislature intended to "harness[ ] the power of competitive markets," RSA 374-F:1, I, as a means to reduce costs to consumers, not as an end in itself.[4] See Appeal of Campaign for Ratepayers Rights, 145 N.H. 671, 673 (2001) (explaining that "the goal of restructuring was to create competitive markets that would produce lower prices for all customers than would have been paid under the then-current regulatory system" (quotation and brackets omitted)). Likewise, we disagree with the PUC's ruling that RSA 374-F:3, III directs the "functional separation" of generation services from transmission and distribution services and elevates that single policy principle over the others identified in the statute.

We acknowledge that the Massachusetts Supreme Judicial Court has interpreted that state's restructuring law differently than we do New Hampshire's statute. See ENGIE Gas v. Dep't of Public Utilities, 56 N.E.3d 740 (Mass. 2016). However, we disagree with the conclusion reached in that case for the reasons stated herein.

We hold that the PUC erred in dismissing Eversource's petition as a matter of law. In light of our decision, we need not address the appellant's remaining arguments. Accordingly, we reverse the PUC's dismissal of the petition and remand to the agency for further proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

HANTZ MARCONI, J., concurred; DALIANIS, C.J., retired, specially assigned under RSA 490:3, concurred; HICKS, J., dissented.

---

[4] Under the PUC's construction, the restructuring statute would preclude approval of Eversource's petition based upon the functional separation principle even if the agency were to conclude, following a full hearing, that the other policy principles identified in the statute clearly outweighed functional separation and that the proposal would produce more reliable electric service at lower rates for New Hampshire consumers than presently exists without any significant adverse consequences. We do not believe that RSA chapter 374-F can sensibly be construed in this fashion.

HICKS, J., dissenting. Because I agree with the Public Utilities Commission (PUC) that Eversource's proposal "is fundamentally inconsistent with the purposes of restructuring," I respectfully dissent.

The majority disagrees with the PUC's determination that "the overriding purpose of the Restructuring Statute," RSA chapter 374-F, "is to introduce competition to the generation of electricity," and instead concludes that "the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers." It therefore interprets RSA chapter 374-F (the Restructuring Statute) to authorize the PUC to expressly undermine competition and to reintegrate electricity generation costs and services with those of transmission and distribution should the PUC find that "other policy principles identified in the statute clearly outweighed functional separation and that the proposal would produce more reliable electric service at lower rates for New Hampshire consumers than presently exists without any significant adverse consequences."

In reaching its construction of the Restructuring Statute, the majority applies a number of admittedly well-recognized tools of statutory construction to interpret selected terms within the statute — for example, consulting a dictionary to define the term "interdependent" and interpreting the term "shall" to "establish[] a mandatory duty," in contrast to "should," which the majority construes to permit discretion. In doing so, however, the majority misses the forest for the trees.

I begin with the recognition that when "we examine . . . statutory language, we do not merely look at isolated words or phrases, but instead we consider the statute as a whole." In the Matter of Maves & Moore, 166 N.H. 564, 566-67 (2014). "In so doing, we are better able to discern the legislature's intent, and therefore better able to understand the statutory language in light of the policy sought to be advanced by the entire statutory scheme." Id. at 567. "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." State Employees Assoc. of N.H. v. N.H. Div. of Personnel, 158 N.H. 338, 343 (2009) (quotation omitted).

Read as a whole, the Restructuring Statute clearly evinces that, while the reduction of consumer electricity costs was both the impetus for the Restructuring Statute and the anticipated result of its enactment and implementation, see RSA 374-F:1 (2009), it was not an end to be obtained by any means the PUC should think appropriate. Indeed, even assuming the majority's point that "the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers," it would be "quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." Henson v. Santander Consumer USA Inc.,

13

137 S. Ct. 1718, 1725 (2017) (quotations and brackets omitted); see also State v. Dor, 165 N.H. 198, 205 (2013) (noting same).

In RSA chapter 374-F, the legislature did not simply mandate rate reduction, but clearly expressed the means by which it sought to achieve that result. The statute's statement of purpose, for instance, provides:

> The most compelling reason to restructure the New Hampshire electric utility industry is to reduce costs for all consumers of electricity by harnessing the power of competitive markets. The overall public policy goal of restructuring is to develop a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment. Increased customer choice and the development of competitive markets for wholesale and retail electricity services are key elements in a restructured industry that will require unbundling of prices and services and at least functional separation of centralized generation services from transmission and distribution services.

RSA 374-F:1, I (emphases added). The legislature sought to reduce electricity costs, to be sure, but sought to do so by restructuring the industry to introduce competition into the market for electricity generation. See Appeal of Campaign for Ratepayers Rights, 145 N.H. 671, 673 (2001) (noting that Restructuring Statute "directed the PUC to design a restructuring plan in which electric generation services and rates would be extracted from the traditional regulatory scheme, unbundled, and subjected to market competition" (quotations omitted)).

The term "restructuring" occurs, in some form, throughout RSA chapter 374-F, including, notably, in the statute's title: "Electric Utility Restructuring." See Greenland Conservation Comm'n v. N.H. Wetlands Council, 154 N.H. 529, 534 (2006) ("The title of a statute is not conclusive of its interpretation, but it is a significant indication of the intent of the legislature in enacting a statute." (citations omitted)). It is not a term the legislature used without context. As the legislature noted in its findings preceding the sections codified as the Restructuring Statute: "Restructuring of electric utilities to provide greater competition and more efficient regulation is a nationwide phenomenon and New Hampshire must aggressively pursue restructuring and increased customer choice in order to provide electric service at lower and more competitive rates." Laws 1996, 129:1, III.

By way of background, "[u]ntil relatively recently, most state energy markets were vertically integrated monopolies," Hughes v. Talen Energy

14

Marketing, LLC, 136 S. Ct. 1288, 1292 (2016), in which "electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems," New York v. FERC, 535 U.S. 1, 5 (2002). Such a utility's "sales were 'bundled,' meaning that consumers paid a single charge that included both the cost of the electric energy and the cost of its delivery." Id. In the 1990s, the Federal Energy Regulatory Commission "commenced a program of deregulating and 'unbundling' the wholesale electric power industry by restructuring and separating electrical generation, transmission, and distribution." MPS Merchant Services, Inc. v. F.E.R.C., 836 F.3d 1155, 1160 (9th Cir. 2016). Subsequently, many states restructured and deregulated their own electric energy markets. See, e.g., id.; Northeast Energy v. Mahar Regional School, 971 N.E.2d 258, 264 n.14 (Mass. 2012) (noting that "[a]doption of the [Massachusetts] restructuring act followed similar changes in Federal law that created competition within the wholesale electric power industry").

Critical to interpreting the Restructuring Statute is the recognition that in the context of this "nationwide phenomenon," Laws 1996, 129:1, III, restructuring is inextricably tied to competition: "Restructuring is nothing short of a complete reordering of the famously staid electric utility industry" and "[t]he raison d'etre of restructuring is to bring about free market-like competition in the industry." Joel B. Eisen, The Environmental Responsibility of the Regionalizing Electric Utility Industry, 15 Duke Envtl. L. & Pol'y F. 295, 313 (2005). Our state legislature clearly used the term in that context. It found that although "[m]onopoly utility regulation has historically substituted as a proxy for competition in the supply of electricity[,] . . . market forces can now play the principal role in organizing electricity supply for all customers instead of monopoly regulation." Laws 1996, 129:1, IV. The legislature therefore concluded that "[i]t is in the best interests of all the citizens of New Hampshire that the general court, the executive branch, and the public utilities commission work together to establish a competitive market for retail access to electric power as soon as is practicable." Laws 1996, 129:1, V. Moreover, the legislature explicitly linked the Restructuring Statute's "transition to competitive markets for electricity" to the "directives of part II, article 83 of the New Hampshire constitution" to protect the people's "inherent and essential right" to "[f]ree and fair competition in the trades and industries." RSA 374-F:1, II.

The Restructuring Statute, which uses some form of the word "compete" (e.g., "competition," "competitive") no fewer than 55 times, was clearly enacted "to create competitive markets that are expected to produce lower prices for all customers than would have been paid under the current regulatory system." RSA 374-F:3, XI (Supp. 2017) (emphasis added). Eversource itself recognizes that fact, but asserts that "twenty years later, the [PUC] and ISO-NE[, the regional electricity market administrator,] have recognized that competition has

15

not achieved its stated purposes." Even assuming that to be the case, however, if the legislature's chosen solution has not achieved the anticipated results, it is neither the PUC's nor this court's place to rewrite the statute. See Appeal of THI of NH at Derry, LLC, 168 N.H. 504, 512 (2016) (noting that when statute's plain language reflects that the asserted statutory goal of keeping nursing home beds in service "is to be accomplished only in the narrow circumstances to which the statute applies[,] . . . the [Health Services Planning and Review] Board had no authority to ignore this requirement to further an arguably more general statutory objective"). The type of policy about-face that would be required to authorize Eversource's proposal should be made, if at all, by the legislature. See, e.g., Dolbeare v. City of Laconia, 168 N.H. 52, 57 (2015) (declining to consider public policy argument in construing statute because "matters of public policy are reserved for the legislature").

Similarly, the contention that the PUC impermissibly elevated the importance of the functional separation principle over RSA 374-F:3's other policy principles — or that functional separation itself was merely a suggestion that the legislature thought the PUC ought to consider — ignores the importance that insisting upon "at least functional separation" plays in implementing and maintaining competition in a formerly vertically integrated industry in which some components remain regulated monopolies. The term "functional separation," while not explicitly defined in the Restructuring Statute, see RSA 374-F:2 (Supp. 2017) (definitions section), may generally be understood to mean "requiring utilities to separate their competitive generation functions from their regulated transmission and distribution functions." Sonnet C. Edmonds, Retail Electric Competition in Kansas: A Utility Perspective, 37 Washburn L.J. 603, 632 (1998). It may also be seen as a less drastic alternative to divestiture, under which "a utility would have to divest itself of all or a portion of its generating assets to another entity or entities in order to remain in the distribution business." Id. at 631; see also Paul L. Joskow & Roger G. Noll, The Bell Doctrine: Applications in Telecommunications, Electricity, and Other Network Industries, 51 Stan. L. Rev. 1249, 1304 (1999) (noting that an alternative approach to "structural separation," i.e., divestiture, "involves functional separation of generation, transmission, and distribution (i.e., costs separations and certain operational separations between competitive and regulated segments) within existing vertically integrated firms, combined with open access and pricing rules for use of the transmission and distribution networks by competing suppliers of generation" (emphases omitted)).

The importance of at least functionally separating generation services from transmission and distribution services is that achieving and maintaining a competitive market in generation services depends upon it. As Professors Joskow and Noll explain, "vertical integration between [the monopolistic transmission and distribution functions] and the [competitive] generation

16

function effectively turns the supply of generating service into a monopoly as well," despite the existence of competitors in the generation market. Joskow & Noll, supra at 1298. Thus, the Supreme Judicial Court of Massachusetts similarly explained that functionally separating generation services from transmission and distribution services in that state's restructuring act "was regarded as a necessary first step in moving toward a fully competitive generation market" because such separation "limit[s] a company's ability to provide itself an undue advantage in buying or selling services in competitive markets." Northeast Energy, 971 N.E.2d at 265 (quotations omitted).

I acknowledge that the legislature used the term "should" in RSA 374-F:3, III (Supp. 2017). I would not, however, "consider [that] word[] . . . in isolation." Appeal of Michele, 168 N.H. 98, 102 (2015) (noting that "we do not consider words and phrases in isolation, but rather within the context of the statute as a whole" (quotation omitted)). To conclude, as the majority does, that "[h]ad the legislature intended to require the PUC to prioritize the 'functional separation' policy principle above all other principles identified in the statute, and to require 'functional separation' in all circumstances, it would have said so," turns a blind eye to the legislature's manifest intent to "transition to competitive markets for electricity." RSA 374-F:1, II.

I note that the Massachusetts Supreme Judicial Court, in ENGIE Gas v. Department of Public Utilities, 56 N.E.3d 740 (Mass. 2016), vacated an order of the Massachusetts Department of Public Utilities in which "the department determined that the plain language of [the Massachusetts restructuring act] provides the department with the statutory authority to approve gas capacity contracts entered into by electric distribution companies, so long as the department first determines that such long-term contracts are in the public interest" and "further concluded that it could properly allow cost recovery for the contracts, including the cost of building the necessary pipeline infrastructure, through electric distribution rates." ENGIE Gas, 56 N.E.3d at 744. The court noted that the language of the statutory provision at issue neither "expressly forbid [the department] from reviewing and approving contracts by electric distribution companies for gas . . . [n]or . . . clearly permit[ted] such activity." Id. at 748. Nevertheless, the court concluded that the department's order was "invalid in light of the statutory language and purpose of [that provision], as amended by the restructuring act, because, among other things, it would undermine the main objectives of the act and reexpose ratepayers to the types of financial risks from which the Legislature sought to protect them." Id. at 742 (emphases added).

Similarly, here, the PUC determined that Eversource's proposal "is fundamentally inconsistent with the purposes of restructuring." The PUC concluded — sustainably, I believe — that "the Capacity Contract is a component of 'generation services' under RSA 374-F:3, III," and that

"[i]ncluding such a generation-related cost in distribution rates would combine an element of generation costs with distribution rates and conflict with the functional separation [principle]." In other words, the PUC implicitly concluded (notwithstanding the use of an arguably permissive "should," as opposed to a directive "shall," in a single provision of the Restructuring Statute) that Eversource's proposal ran directly contrary to the legislature's manifest intent, expressed throughout the statute, to extricate generation from transmission and distribution and to establish a competitive market for the former. RSA 374-F:3, III. But see RSA 374-F:1, I ("Increased customer choice and the development of competitive markets for wholesale and retail electricity services are key elements in a restructured industry that will require unbundling of prices and services and at least functional separation of centralized generation services from transmission and distribution services." (emphases added)). I believe that the PUC's decision is correct, and, in any event, was well within the discretion the legislature delegated to the PUC by providing a set of "interdependent policy principles . . . to guide the [PUC] in implementing a statewide electric utility industry restructuring plan . . . and in regulating a restructured electric utility industry." RSA 374-F:1, III (emphasis added). I respectfully dissent.