Health Services Planning and Review Board
No. 88-397

### APPEAL OF PSYCHIATRIC INSTITUTES OF AMERICA

### APPEAL OF LAKE SHORE HOSPITAL

### APPEAL OF MEDIPLEX, INC.

(New Hampshire Health Services Planning and Review Board)

August 23, 1989

*Sulloway Hollis & Soden*, of Concord (*Eleanor H. Holmes* on the brief and orally), for Psychiatric Institutes of America.

*Rath, Young, Pignatelli and Oyer P.A.*, of Concord (*Eve H. Oyer* on the brief and orally), for Lake Shore Hospital.

*McSwiney, Jones, Semple & Douglas*, of Concord (*Carroll F. Jones* on the brief and orally), for Mediplex, Inc.

*Upton, Sanders & Smith*, of Concord (*Russell F. Hilliard* on the brief and orally), for Whispering Pines.

JOHNSON, J. Psychiatric Institutes of America, Lake Shore Hospital and Mediplex, Inc. appeal from a decision of the Health Services Planning and Review Board granting a certificate of need on reconsideration to James and Maureen O'Neil for the establishment of an alcohol and drug rehabilitation facility known as Whispering Pines. Psychiatric Institutes of America and Mediplex, Inc. appeal as well from the denial of certificates of need which would allow each of them to construct an alcohol and drug

rehabilitation facility. For the reasons that follow, we vacate the order granting the certificate of need for Whispering Pines and remand. We affirm the order denying certificates of need to Psychiatric Institutes of America and Mediplex, Inc.

In July 1984, Mediplex, Inc. (Mediplex) filed a letter of intent with the State Health Services Planning and Review Board (the board) to establish a 152-bed specialty hospital for the treatment of alcohol and substance abuse patients. Within sixty days, Psychiatric Institutes of America (P.I.A.) filed an application for a certificate of need (CON) to build a 60-bed alcohol/substance abuse specialty hospital. This application and Mediplex's application, which was filed in October 1984, were "batched" together as competing applications. *See* RSA 151-C:7, VI(b) (Supp. 1983); N.H. ADMIN. RULES, He-Cer 306.01(g) (1985).

In February 1985, James and Maureen O'Neil filed an application to establish an 80-bed adolescent alcohol and drug rehabilitation facility to be known as Whispering Pines. Because of delays in reviewing P.I.A.'s and Mediplex's applications, hearings for these two applications and the Whispering Pines application were held on the same day. On May 23, 1985, all three applications were denied.

In mid-June, 1985, the O'Neils moved for reconsideration of their application. Neither P.I.A. nor Mediplex did so. On July 26, 1985, the board held a reconsideration hearing and granted a CON to the O'Neils for the establishment of Whispering Pines. The board did not notify P.I.A. or Mediplex of this reconsideration hearing.

In August 1985, P.I.A., Mediplex and Lake Shore Hospital (Lake Shore) moved for reconsideration of the decision granting a CON for Whispering Pines on a number of grounds. P.I.A. and Mediplex contended, *inter alia*, that they had submitted "competing" applications and should have been notified of the reconsideration hearing. On October 21, 1985, the board issued an order stating that it would conduct a hearing to reconsider all three applications and that it would treat the three applications as competing and consider them in relation to each other. The board scheduled a hearing for December 13, 1985.

That hearing, however, was postponed while this court considered a petition for declaratory judgment filed by P.I.A., seeking a ruling as to the effect of the governor's moratorium on the issuance of CON's, which became effective June 1, 1985. *See Psychiatric Inst. of America v. Mediplex*, 130 N.H. 125, 536 A.2d 169 (1987) (governor's moratorium on issuance of CON's not applicable). On July 22, 1988, the board issued an order affirming its earlier

decision to treat the three applications as competing, stating for the first time that the reason for this decision was its prior failure to notify P.I.A. and Mediplex of the reconsideration hearing. The order also stated that the scope of the evidence would be "limited to that which was before the Board prior to May 23, 1985," and that it would "only consider new information as defined in RSA 151-C:9, IV(a)(1)–(4) [(Supp. 1988)]."

On August 12, 1988, the board held the reconsideration hearing. On September 23, 1988, the board voted orally to reaffirm its earlier decision granting a CON to Whispering Pines and denying CON's to both P.I.A. and Mediplex. It did not issue a written decision at that time. On October 28, 1988, following these appeals of the board's September 23 decision by P.I.A. and Lake Shore, the board voted to adopt a written decision, prepared by its staff, which was, according to the board chairman, consistent with the "preliminary" vote of September 23. The written decision, including findings of fact, was issued October 31, 1988.

On appeal, the parties raise a number of issues. P.I.A. and Mediplex in a joint brief argue that the rehearing held on August 12, 1988, failed to meet the statutory requirements of RSA chapter 151-C (Supp. 1983), the statute pertaining to the issuance of CON's which was in effect on the date of the board's initial decision to deny the CON for Whispering Pines. *See Psychiatric Inst. of America v. Mediplex*, 130 N.H. at 129–30, 536 A.2d at 171. They contend as well that the board violated this statute and its own regulations, in effect on that date, by failing to apply the statutory criteria, by considering irrelevant criteria, and by failing to consider the comparative merits of the competing applications in reaching its decision to issue the CON to Whispering Pines and to deny their applications. They also assert that the board violated their due process rights by failing to deliberate on the merits of the applications and by failing to issue a written decision that accurately reflected the board's deliberations. P.I.A. argues individually that the board's decision to grant a CON for the Whispering Pines facility and to deny its application was contrary to the clear, unrebutted evidence demonstrating that P.I.A.'s application was superior to those for Whispering Pines and Mediplex.

Lake Shore, which operates a specialty bed hospital and has opposed the granting of additional CON's, in addition to joining in several of the claims raised by P.I.A. and Mediplex, argues that the board failed to make the findings required by RSA 151-C:6, III (Supp. 1983). It argues as well that the board violated the statute

and its own rules by granting a CON which did not comply with the State Health Plan. Whispering Pines responds to the issues raised by the other parties, and also contends that none of the parties is properly before this court.

We must first take up Whispering Pines' claim that none of the parties has standing. RSA 151-C:9, I (Supp. 1983) states:

"Any person submitting an application for a certificate of need, if aggrieved or dissatisfied with the decision of the state agency, shall have the right, upon a petition which provides a detailed statement of the grounds upon which the decision of the state agency is claimed to be erroneous and contrary to the facts and the law, to appeal from said decision to the supreme court pursuant to RSA 541."

RSA 541:6 provides: "Within thirty days after the application for a rehearing is denied, or, if the application is granted, then within thirty days after the decision on such rehearing, the applicant may appeal by petition to the Supreme Court." Since P.I.A., Mediplex and Lake Shore moved for rehearing as parties or persons directly affected (*see* RSA 541:3) and the motions were not granted, they are proper appellants under RSA chapter 541, given the procedural posture of the case now before us.

We next address Lake Shore's claim that the board violated the statute governing the issuance of CON's, and its own rules, by granting a CON which did not comply with the State Health Plan. Specifically, Lake Shore argues that the board could not have issued a CON to Whispering Pines because the board had before it uncontroverted evidence that existing alcohol detoxification and rehabilitation programs in New Hampshire did not have an annual average occupancy rate of 80% for the two most recent years as required by the State Health Plan. We examine this issue at this time because Lake Shore argues that if it is correct, then the board could not properly have granted a CON to either P.I.A. or Mediplex, and therefore, any other errors which may have been committed by the board, as alleged by P.I.A. and Mediplex, were harmless.

The State Health Plan is referenced by RSA 151-C:8, I (Supp. 1983), which provides in part:

"The decision of the state agency to issue, deny or withdraw a certification of need, except in emergency circumstances which pose a threat to public health, *shall be consistent with*

the state health plan in effect on the date the letter of intent is filed with the state agency."

(Emphasis added.) The applicable State Health Plan (FY 83-85) included in its Appendix VI C, entitled "Program Specific Assurances," a section labeled "Standards and Guidelines for Alcohol Detoxification and Rehabilitation Services." SA 9 of that section states: "There shall be an annual average 80% occupancy rate for the two most recent years in alcohol detoxification and rehabilitation programs and facilities prior to consideration for expansion." Lake Shore argues that in order to be "consistent with" this mandate found in the State Health Plan, the board was required to comply strictly with this provision, which, according to Lake Shore, it did not do.

The board, in its written decision of October 31, 1988, granting Whispering Pines a CON, held:

"The Board upholds its decision that the Standards in the State Health Plan were met. This was demonstrated in evidence supplied by Lakes Region General Hospital ... and Frisbee Memorial Hospital ... and included as part of the record in the October 21, 1985 Pre-Hearing Order. This information indicates that patients with drug and alcohol diagnosis were being treated in Medical Surgical beds instead of substance abuse beds. Thus, there were sufficient substance abuse patients to meet the 80% standard."

The board thus found in substance that the 80% standard was met if it took into account data indicating that alcohol abuse patients were using medical surgical beds. The clear language of the provision, however, requires an annual average 80% occupancy rate for "alcohol detoxification and rehabilitation programs and facilities." Since by its language the provision excludes consideration of the use of medical surgical beds, we must determine whether the board was required to comply strictly with the part of the provision which called for 80% occupancy in "alcohol detoxification and rehabilitation facilities," or whether the board had flexibility and discretion in determining what it would consider in deciding whether the 80% figure had been met.

The particular provision of the State Health Plan at issue is found in a section labeled "Standards and Guidelines ...." Although the term "guideline" connotes a large measure of discretion, the term "standard," as "something that is set up and established by authority as a rule ...," WEBSTER'S THIRD NEW IN-

TERNATIONAL DICTIONARY 2223 (unabridged ed. 1961), indicates little, if any, flexibility. In examining the "Standards and Guidelines" listed, we note that some provisions use the word "should"; others, as the one before us, employ the word "shall". The use of the word "shall" supports the conclusion that the particular provision articulates a standard which does not allow for discretion. *See N.H.-Vt. Health Serv. v. Comm'n of Ins.*, 122 N.H. 268, 272, 444 A.2d 508, 510 (1982). However, when we examine the statute which refers to the State Health Plan, we conclude that the board does have a measure of discretion in determining whether the 80% figure had been met. RSA 151-C:8, I (Supp. 1983) states that the board's decision must be "consistent with" the State Health Plan. We hold that in order to be "consistent with" the 80% occupancy standard, the board had the discretion to take note of the use of medical surgical beds by alcohol and substance abuse patients. *See Roanoke Memorial Hospitals v. Kenley*, 3 Va. App. 599, 606, 352 S.E.2d 525, 529 (Va. App. 1987) (plain meaning of the term "consistent with" is "'in harmony with,' 'compatible with,' 'holding to the same principles,' or 'in general agreement with . . . .'") However, the 80% figure had to be strictly met in order to comply with the State Health Plan.

■■■ Although the board could take note of the number of substance abuse patients using other types of facilities, we are unable from an examination of the evidence relied upon by the board to determine whether the board's decision that the 80% occupancy rate had been achieved is supported by the evidence. The board relied on two letters it had solicited from hospitals without distinct detoxification units. We note that although there was evidence that the great majority of the facilities which had not achieved 80% occupancy were either under construction or not yet open, and the 80% standard does not make it clear whether such facilities should be included, the board did not reach its finding that the 80% standard had been met by excluding these beds from the census. Although each letter states the number of patients with a primary or secondary diagnosis relative to alcohol or substance abuse that each particular hospital had treated in the past two years, and one letter determined how many beds at an 80% occupancy rate the patients would have occupied if the hospital had a distinct detoxification unit, neither letter articulates how these figures relate to the 80% occupancy rate required by the State Health Plan. Thus, we are unable to determine from the evidence whether there was a basis for the board to conclude that the use by these patients of medical surgical beds compensates, in some

sense, for the failure of detoxification programs and facilities, most of which were not operational, to reach the 80% figure, and thus whether the evidence supports the board's conclusion that the 80% figure had been met. Furthermore, the board made no findings which support its conclusion that the 80% figure had been met, other than referring to the evidence just described. Because we are thus unable to determine whether the board acted in accordance with RSA 151-C:8, I (Supp. 1983), we vacate and remand the order granting a CON to Whispering Pines. As we do so, we emphasize that an agency is required to set forth findings which will enable meaningful judicial review. *N.H.-Vt. Health Serv. v. Comm'n of Ins.*, 122 N.H. at 273, 444 A.2d at 510.

We now turn to the claim of P.I.A. and Mediplex, in which Lake Shore concurs, that the board erred in considering, or failing to consider, certain factors in reaching its decisions. The claim has several parts based on RSA 151-C:6, I (Supp. 1983), which requires the agency in reaching its decision to "consider only the criteria which have been duly adopted and published ...." The parties argue first that the board failed to "consider" the required criteria as shown by the board's lack of discussion regarding the criteria during its pre-vote deliberations. They argue next that the board erroneously based its decision on the fact that Whispering Pines had been operating for a period of two years following the granting of the CON in July 1985. P.I.A. and Mediplex claim as well that the board erred in failing to consider the comparative merits of the competing applications. We first address the claim that the board erroneously considered the fact that Whispering Pines was operational, because in doing so we answer the other claims as well.

The September 23, 1988 board meeting, at which the board voted to affirm its earlier decision to grant a CON to Whispering Pines, consisted almost entirely of the following discussion:

> "[One board member stated:] '... I feel it would be patently unfair at this stage of the game to revoke a CON that's properly issued. And that's why I'm supporting the motion [to affirm the Whispering Pines CON] that is before us.'

> "[Another responded:] 'I want to concur with [the first board member]. I was opposed for reasons of occupancy and so-forth at the time. But I don't think we can turn around in two or three years and change our minds on the action of the Board that was the majority vote at the time.'

> "[A third stated:] 'I feel exactly the same.'

> ...

> "[A fourth board member said:] '... I am also convinced that there was no new evidence presented at the reconsideration hearing which would show us that we made an incorrect decision the first time around.'
>
> "[A fifth responded:] 'I'd like to echo your statement. Even though I wasn't here for the hearing, I did get the minutes, and read it all, and I didn't find anything in the minutes of that hearing that gave any new information.'"

Based on this discussion, the parties conclude that despite the statement in the later written decision issued October 31, 1988, that "[t]he Board finds that Whispering Pines was operating at risk pending the outcome of this hearing and, thus, the implications of withdrawing Whispering Pines CON are not an issue in this review," the board did in fact consider the implications. Such consideration would be contrary to RSA 151-C:6, I (Supp. 1983), which lists the appropriate criteria to be considered, and the board's prehearing order of July 22, 1988, which restricted the evidence to be considered to that which was before the board prior to May 23, 1985, the date of the original decision. However, in our opinion, the minutes do not indicate, as appellants urge, that the board was influenced by the fact that Whispering Pines was operational. Rather, in our opinion, the minutes reveal the board members' opinions that grounds had not been shown for concluding that the board's prior decision had been incorrect. Looking back at the discussion, we find one board member who thought it unfair to revoke a CON that had been "properly" issued. Two other board members believed they could not now change what had been the majority vote, presumably one that was free from error. Two other board members specifically concluded that in their opinions no new information had been provided which revealed that the earlier decision had been incorrect.

What becomes clear, upon close examination of the minutes, is not the board's awareness of the fact that Whispering Pines was operational, but the board's treatment of the hearing as one for reconsideration of its prior decision to grant Whispering Pines a CON, see N.H. ADMIN. RULES, He-Cer 302.02(c) (1985) (decision shall be upheld on reconsideration "absent a showing that the final decision was unreasonable, capricious, against the weight of evidence, or not in accordance with the agency's procedure ...."), rather than as a first opportunity to review the three applications in relation to each other. The board's focus on determining whether its prior decision had been incorrect is evident, as well, in the board's written decision, which listed the following findings:

"— No new evidence was presented at the public hearing to indicate that the Board erred in its original decision.

"— There have been no significant changes in the factors and circumstances relied upon by the Board since the original decision on July 26, 1985.

"— Northern Meadows [P.I.A.], Lake Shore Hospital and Ridgeview [Mediplex] did not demonstrate that their participation as a party had any impact on the Board's original decision."

We note that the first two findings follow the language of RSA 151-C:8, III (Supp. 1983), which defines what constitutes "good cause" for granting a reconsideration hearing.

Having reached the conclusion that the board treated the hearing as one for reconsideration of its decision granting Whispering Pines a CON, we must now determine whether the board erred in doing so. P.I.A. and Mediplex argue that the board was required to consider the comparative merits of the three applications. The board's prehearing order dated October 21, 1985, stated that at the hearing "[a]ll three applicants shall be considered competing applicants and shall be considered in relation to each other." The July 22, 1988, order reaffirmed the board's intention to consider the parties' comparative merits. Whispering Pines, however, contends that the board had no authority to so treat the applicants. We agree.

RSA 151-C:7, VI(b) (Supp. 1983) provides that "[i]n order for a competing application to qualify for consideration by the state agency[,] ... [i]t must be filed ... within 60 days of the date of notification of receipt of an original applicant's letter of intent ..." and it must be complete. There is no dispute that Whispering Pines failed to meet this 60-day deadline. Because the Whispering Pines application did not "qualify for consideration by the state agency" as a competing application under RSA 151-C:7, VI(b) (Supp. 1983), we must determine whether the board nevertheless had the discretion to consider the Whispering Pines application in relation to the applications filed by P.I.A. and Mediplex. Upon consideration, we hold that RSA chapter 151-C (Supp. 1983) and the rules enacted thereunder, see RSA 151-C:10, I (Supp. 1983); N.H. ADMIN. RULES, He-Cer 301.01–311.01 (1985), did not allow the board to consider the three applications as competing.

According to a rule adopted by the agency, all applications which qualify as competing under RSA 151-C:7, VI(a) (Supp. 1983), and which are filed within 60 days, and the original application submitted during a specified period "will be reviewed simultaneously and considered in relation to each other." N.H. ADMIN. RULES,

He-Cer 306.01(c). This rule does not by itself necessarily prevent the board from considering the comparative merits of other applications which do not meet the 60-day deadline. However, RSA 151-C:6, I (Supp. 1983) prohibits the agency, in reaching a decision to grant or deny a CON, from considering any criteria which have not been "duly adopted and published." Although the agency must consider "[t]he comparative merits of competing applications which meet the requirements of RSA 151-C:7, VI(b) ...," RSA 151-C:6, I(n) (Supp. 1983); N.H. ADMIN. RULES, He-Cer 304.01(n) (1985), no provision allows the board to consider the comparative merits of competing applications, see RSA 151-C:7, VI(a) (Supp. 1983), which do not meet the requirements of RSA 151-C:7, VI(b) (Supp. 1983). Therefore, under the statute and rules, the board was not permitted to consider the Whispering Pines application in relation to the applications filed by P.I.A. and Mediplex, since the board may consider only criteria "duly adopted."

In determining that the statute did not permit the board in the instant case to treat the three applications as competing, we note that it was only after reconsideration of the Whispering Pines application, and a failure by the other applicants to request reconsideration, that the board made the decision to treat the three applications as competing. Thus, this is not a case where the board initially sought to treat an application on which review had been delayed, see RSA 151-C:7, XIII (Supp. 1983), as competing with an application, which although filed at a later date, was then undergoing review.

The board's failure to notify P.I.A. and Mediplex of the reconsideration hearing on the Whispering Pines application does not justify the board's decision in its October 21, 1985 order to treat all three applications as competing. Even if P.I.A. and Mediplex should have been given the opportunity to participate in the hearing, they would not have been entitled to have their own applications considered, as the applications did not "qualify for consideration" under RSA 151-C:7, VI(b) (Supp. 1983), nor had they requested reconsideration of the board's denial of their respective applications. See RSA 151-C:8, III (Supp. 1983).

In addition, our decision in *Appeal of Behavior Science Institute*, 121 N.H. 928, 436 A.2d 1329 (1981) does not persuade us to reach a contrary result. In that case we upheld the decision of the State Office of Health Planning and Development, on reconsideration, to treat an application which had not been filed within sixty days of the original applicant's letter of intent as a competing application. 121 N.H. at 933, 935, 436 A.2d at 1332–33. In that case, however,

the original applicant's application was found to be incomplete long after the "competing" applicant had filed an application. The original applicant had also made changes in its application during the process about which the other applicant was not informed. We therefore held that the original applicant's application could be remanded to the initial application stage for consideration in relation to the "competing" application. We emphasized in that case that our decision to "overlook[ ]" the error in failing to file within sixty days "in this instance," was largely influenced by the absence of rules defining the terms "competing" and "completed" application. *Appeal of Behavior Science Institute*, 121 N.H. at 935, 436 A.2d at 1333. In contrast, the rules in place throughout the process in the instant case clearly set out when an application shall be considered in relation to another application, including when an applicant must have submitted a completed application. See N.H. ADMIN. RULES, He-Cer 306.01 (1985).

We also find inapposite the United States Supreme Court decision of *Ashbacker Radio Co. v. F.C.C.*, 326 U.S. 327, 333 (1945), adopted in *Appeal of Behavior Science*, 121 N.H. at 935, 436 A.2d at 1333. In that case, the Federal Communications Commission granted one of two mutually exclusive applications for a radio station license before it held a hearing on the other application. This action served to deny the other applicant an opportunity to obtain a license. In the instant case, the board held hearings on all three applications, and following the hearings any one or more of the applications could have been granted. After the board denied all three applications, only Whispering Pines requested reconsideration and was granted a rehearing. Thus, it cannot be said in the instant case that either P.I.A. or Mediplex was denied an opportunity to have its application heard. *See Ashbacker*, 326 U.S. at 333. We are also aware of no finding or ruling by the board as to need that would have ruled out the board's granting more than one application. *See id.*

■ Although the board erred in ruling prior to the August 12, 1988 reconsideration hearing that it would consider all three applications in relation to each other, the parties were informed through the board's prehearing orders that the hearing would address this issue, and they prepared and presented evidence with that understanding. Since the parties did not have the opportunity to present evidence appropriate to a motion for reconsideration of the board's decision granting a CON for Whispering Pines, we remand the case for a rehearing to allow the presentation of

evidence consistent with New Hampshire Administrative Rule He-Cer 302.02 (1985).

Having found that the board was correct in treating the August 12, 1988 hearing as one for reconsideration of its prior decision granting a CON, we need not address the claim that the board failed to deliberate on the criteria in RSA 151-C:6, I (Supp. 1983). In addition, because we find that the board could not have reconsidered its denial of a CON to P.I.A. or Mediplex, we do not reach the other claims raised by P.I.A., Mediplex and Lake Shore concerning the hearing and written decision.

*Vacated and remanded in part; affirmed in part.*

SOUTER, J., did not sit; the others concurred.