LYNN, C.J.
 

 The appellants, Algonquin Gas Transmission, LLC (Algonquin) and Public Service Company of New Hampshire d/b/a Eversource Energy (Eversource), appeal an order of the New Hampshire Public Utilities Commission (PUC) dismissing Eversource's petition for approval of a proposed contract for natural gas capacity, as well as a program to set parameters for the release of capacity and the sale of liquefied natural gas made available to electric generators, and/or an associated tariff. The appellees, NextEra Energy Resources, LLC (NextEra), Conservation Law Foundation (CLF), and the Office of the Consumer Advocate (OCA), appear in opposition to this appeal. We reverse and remand.
 

 I
 

 The following facts are supported by the record. Eversource is a public utility company operating under New Hampshire law as an electric distribution company (EDC). Algonquin is an owner-operator of a gas pipeline located in New England.
 

 In April 2015, the PUC issued an Order of Notice announcing an investigation "into potential approaches involving New Hampshire's [EDCs] to address cost and price volatility issues currently affecting wholesale electricity markets in New Hampshire." As background, the PUC explained that in 1996 the legislature enacted RSA
 

 chapter 374-F, the electric utility restructuring chapter, with the "overall public policy goal" of developing "a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment." (Quoting RSA 374-F:1 (2009).) The PUC noted that over the two decades following the chapter's enactment, "competitive electricity markets have developed in New Hampshire, at both the wholesale and retail levels," and that, "[u]ntil recently, market competition at the wholesale and retail levels has tended to keep electricity prices at reasonable levels for New Hampshire consumers."
 

 The PUC observed, however, that the previous two years had "seen significant transitions in New Hampshire's wholesale and retail electricity markets, and those of the New England region generally," including "an increasing dependence on natural gas-fueled generation plants within the region ... as aging coal, oil, and nuclear plants have been retired." According to the PUC, "[d]uring recent winters, significant constraints on natural gas resources have emerged in New England, despite abundant natural gas commodity production in the Mid-Atlantic States and elsewhere," leading to "extreme price volatility in gas markets in the winter months in our region, which, in turn, have resulted in sharply higher wholesale electricity prices." The PUC stated that, "[o]verall, the average retail price of electricity in New England is the highest in the continental United States, posing a threat to our region's economic competitiveness."
 

 Recognizing that it has "a fundamental duty to ensure that the rates and charges assessed by EDCs are just and reasonable," the PUC acknowledged that "the potential development of additional natural gas resources for the benefit of the electricity supply in our region should be carefully considered," and that "[a] targeted Staff investigation to examine the gas-resource constraint problem that is affecting New Hampshire's EDCs and electricity consumers generally may yield potential solutions to these market issues." Accordingly, the PUC directed PUC Staff (Staff) to, among other things, "inquire with the EDCs ... regarding potential means of addressing these market problems" and provide the PUC with a report no later than September 15, 2015.
 

 In the context of that investigation, certain stakeholders asked whether RSA chapter 374-F prohibits EDCs from acquiring gas capacity. In response, Staff issued a memorandum on July 10, 2015, opining that the PUC
 

 may find that a proposal by an EDC to acquire incremental gas capacity, for the use of gas-fired generators, could enhance power system reliability (especially in winter when existing gas capacity is constrained), and thus help the EDC meet its duty to provide reliable service under RSA 374:1 ; provide public benefits related to the provision of electricity (e.g., less price volatility, enhanced winter reliability, etc.); and serve as an element of New England-wide cooperation to reduce gas capacity constraints in order to provide for the displacement of oil and coal-fired electric generation by cleaner gas-fired electric generation. If the [PUC] were to decide that these goals were congruent with various Restructuring Policy Principles [in RSA 374-F:3 ], and that these principles were not overridden by the single principle of generation-distribution separation in RSA 374-F:3, III, it could conclude that RSA Chapter 374-F does not preclude such an EDC capacity purchase. Furthermore, an EDC making such a proposal
 could argue that provision of gas capacity to unaffiliated merchant generators does not violate the functional separation principle of RSA 374-F:3, III in the first instance, in that New Hampshire EDCs would not actually acquire the gas capacity for their own use, but rather, would make such capacity available for the use of merchant generators in a bilateral transaction.
 

 On September 15, 2015, Staff issued a 49-page report on its investigation into potential approaches to mitigate wholesale electricity prices.
 
 [1]
 
 Staff reiterated that the policy principle in RSA 374:F-3, III (2009), that generation services should be "at least functionally separated from transmission and distribution services," RSA 374-F:3, III, should be read in concert with other restructuring policy principles set forth in the statute that are "of similar importance to the functional separation principle." In doing so, Staff concluded that the PUC "could rule, in response to a proposal being made by a New Hampshire EDC, that the potential benefits of a gas-capacity acquisition project would foster the overall goals of the Restructuring Policy Principles of RSA [chapter] 374-F," which include "cost savings for distribution customers of EDCs; enhanced reliability for New England's increasingly gas-dependent electric generation fleet and electric transmission system; and environmental benefits from the displacement of inefficient coal and oil generation units by highly efficient gas generation units." Staff noted "that quality evidence of such benefits will be of critical importance in gauging the appropriateness of a given proposal under RSA [chapter] 374-F."
 

 In January 2016, the PUC accepted the Staff report "as compliant with the directives" it had set out. The PUC noted that, although the Staff report set forth Staff's view that "there exists a path under New Hampshire law for the approval of acquisitions of natural gas capacity resources by New Hampshire EDCs for the economic benefit of their customers and the customers of other regional EDCs," it was clear to the PUC "that no consensus exists regarding the potential legality of such an acquisition of gas capacity by a New Hampshire EDC" and the PUC expected "that such a capacity acquisition would be highly controversial."
 

 Accordingly, the PUC stated its intention "to rule on the question of whether a New Hampshire EDC has the legal authority to acquire natural gas capacity resources to positively impact electricity market conditions, only within the context of a full adjudicative proceeding ..., and only in response to an actual (as opposed to hypothetical) petition." The PUC explained that, in such a circumstance, it would consider a petition "in separate phases." In the first phase, the PUC "would review briefs submitted by the petitioner EDC, Staff, and other parties regarding whether such capacity procurement is allowed under New Hampshire law." If the PUC were to rule against the legality of such a petition, the petition would be dismissed, but, if not, a second phase of the proceeding would take place "to examine the appropriate economic, engineering, environmental, cost recovery, and other factors presented by the actual proposal." In doing so, the PUC would allow "discovery, testimony, rebuttal testimony, and cross-examination."
 

 In February 2016, Eversource petitioned the PUC "for approval of a Precedent Agreement for firm gas transportation and storage services between Eversource and Algonquin ... relative to the proposed Access Northeast ('Access Northeast' or 'ANE') pipeline project (the 'ANE Contract')." Eversource requested the PUC's approval of: (1) "the ANE Contract, which is a 20-year interstate pipeline transportation and storage contract providing natural gas capacity for use by electric generation facilities"; (2) "an Electric Reliability Service Program ... to set parameters for the release of capacity and the sale of liquefied natural gas ... supply available by virtue of the ANE Contract"; and (3) "a Long-Term Gas Transportation and Storage Contract ... tariff, which allows for recovery of costs associated with the ANE Contract."
 
 [2]
 

 In March 2016, the PUC issued an Order of Notice of its receipt of Eversource's petition. The PUC noted that "[t]he filing raises,
 
 inter
 

 alia
 
 , issues related to whether" the contract "would violate the Restructuring Principles of RSA Chapter 374-F." Accordingly, the PUC opened the first phase of its proceeding to "review briefs submitted by Eversource, Staff and other parties regarding whether the Access Northeast Contract, and affiliated program elements, is allowed under New Hampshire law."
 

 In October 2016, the PUC dismissed Eversource's petition, concluding as a matter of law that Eversource's proposal conflicted with the principles and requirements of RSA chapter 374-F. After reviewing the stated purposes of the statute set forth in RSA 374-F:1, I and II, and the so-called "functional separation" restructuring policy principle set forth in RSA 374-F:3, III, the PUC ruled that "the overriding purpose of the Restructuring Statute is to introduce competition to the generation of electricity," with the "long-term results [to] be lower prices and a more productive economy." It explained that "[t]o achieve that purpose, RSA 374-F:3, III directs the restructuring of the industry, separating generation activities from transmission and distribution activities, and unbundling the rates associated with each of the separate services." Thus, the PUC concluded that "the proposal brought forward by Eversource is fundamentally inconsistent with the purposes of restructuring." The PUC subsequently denied Eversource's and Algonquin's motions for reconsideration, and this appeal followed.
 

 II
 

 On appeal, Eversource argues that the PUC's determination that "the overriding purpose of the Restructuring Statute was to introduce competition to the generation of electricity" resulted from an interpretation of the statute that fails to "comport with the stated purpose of the law, ignores nearly all of the interdependent policy principles enumerated in it, and undermines the authority the Commission has been granted relative to the implementation of the law." (Quotation omitted.) According to Eversource, the PUC "was wrong as to both the expressed purpose of the law and in finding a mandate or directive for the separation of generation and transmission and distribution services within it." Because the PUC's order failed
 to properly construe RSA chapter 374-F and because that failure "colored the entire order," Eversource contends that it should be reversed. (Capitalization and bolding omitted.)
 

 Algonquin agrees with Eversource that the PUC erred when it concluded that the fundamental purpose of RSA chapter 374-F is to encourage competition in the generation of electricity, arguing that this finding "directly contravenes the plain language of the Restructuring Statute, is inconsistent with its legislative history, and confuses the goals of the Restructuring Statute with the methods by which to achieve those goals." Algonquin asserts that the PUC's analysis "conflate[d] the
 
 purpose
 
 of the Restructuring Statute with the
 
 methods
 
 employed by the Restructuring Statute," and, in doing so, "leapt to the unsupported conclusion that the goal of the Restructuring Statute is competition for its own sake."
 

 The parties that appear in opposition to this appeal disagree with Eversource and Algonquin. CLF argues that the PUC correctly interpreted RSA chapter 374-F to conclude that Eversource's proposal "would violate the Act's overriding purpose of establishing
 
 competition
 
 in the generation of electricity by separating electric generation from electric distribution and protecting ratepayers from generation-related risks." According to CLF, the PUC's interpretation of the statute "is owed deference, [and] is supported by the unambiguous language of the Act, including its purposes to restructure the industry to reduce costs for consumers 'by harnessing the power of competitive markets,' RSA 374-F:1, I, and to serve the 'essential right of the people' to have '[f]ree and fair competition' and be 'protected against all monopolies and conspiracies which tend to hinder or destroy it.' " (Quoting N.H. CONST. pt. II, art. 83.) (Quotations omitted.)
 

 OCA asserts that the PUC "did not ... apply one of the policy principles to the inappropriate exclusion of others," nor did it "read too much into the Legislature's use of the word 'should' in the so-called functional separation principle." Rather, it contends, the PUC "kept faith with its instructions in the implementation section, RSA 374-F[:]4," that "the Legislature has declared that in its restructured state New Hampshire's electric industry now relies on the competitive market for everything related to generation."
 

 Likewise, NextEra argues that "there would have been no electric utility restructuring ... without the extraction of generation and subjecting it to the market" and, therefore, the PUC's "decision to dismiss the Eversource Petition because it violated the Separation and Unbundling Requirements is supported by the Commission's discernment that the overriding purpose of the Restructuring Statute was the introduction of generation to competition." Furthermore, NextEra asserts that "the fact that the Commission used its informed judgment to focus on the one interdependent policy principle most directly implicated, and cross-referenced in many of the other principles, was reasonable and consistent with the express language of the Restructuring Statute."
 

 III
 

 A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. RSA 541:13 (2007);
 
 see
 

 Appeal of Pennichuck Water Works
 
 ,
 
 160 N.H. 18
 
 , 26,
 
 992 A.2d 740
 
 (2010). Although we give the PUC's policy choices "considerable deference" in reviewing its decisions rendered
 on the merits, we do not defer to its statutory interpretation.
 
 Pennichuck
 
 ,
 
 160 N.H. at 26
 
 ,
 
 992 A.2d 740
 
 . Where, as here, the issue presented is purely a question of law, we review the PUC's statutory interpretation
 
 de
 

 novo
 
 .
 
 See
 

 id.
 
 ;
 
 see
 

 also
 

 Appeal of Town of Seabrook
 
 ,
 
 163 N.H. 635
 
 , 644,
 
 44 A.3d 518
 
 (2012) (explaining that while an interpretation of a statute by the agency charged with its administration is entitled to some deference, we are still the final arbiter of the legislature's intent and are not bound by an agency's interpretation of a statute);
 
 Appeal of Bretton Woods Tel. Co.
 
 ,
 
 164 N.H. 379
 
 , 386,
 
 56 A.3d 1266
 
 (2012).
 
 [3]
 

 "In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole."
 
 Roy v. Quality Pro Auto
 
 ,
 
 168 N.H. 517
 
 , 519,
 
 132 A.3d 418
 
 (2016) (quotation omitted). "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning."
 

 Id.
 

 (quotation omitted). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.
 
 LLK Trust v. Town of Wolfeboro
 
 ,
 
 159 N.H. 734
 
 , 736,
 
 992 A.2d 666
 
 (2010). We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.
 

 Id.
 

 Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole.
 

 Id.
 

 This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme.
 

 Id.
 

 IV
 

 The issue we address is a narrow one-whether the PUC erred when it determined as a matter of law that, on its face, "the proposal brought forward by Eversource is fundamentally inconsistent with the purposes of restructuring" and, thus, is prohibited under RSA chapter 374-F. In denying Eversource's petition, the PUC first ruled "that the overriding purpose of the Restructuring Statute is to introduce competition to the generation of electricity" with the "long-term results [to] be lower prices and a more productive economy." The PUC then further ruled that "[t]o achieve that purpose, RSA 374-F:3, III
 
 directs
 
 the restructuring of the industry, separating generation activities from transmission and distribution activities, and unbundling the rates associated with each of the separate services." (Emphasis added.) Given these rulings, the PUC concluded that "the basic premise of Eversource's proposal-having an EDC purchase long-term gas capacity to be used by electric generators-runs afoul of the Restructuring Statute's functional separation requirement." We disagree.
 

 In 1996, the legislature found that "New Hampshire has the highest average electric rates in the nation and such rates are unreasonably high." Laws 1996, 129:1, I. These high electric rates, combined with
 the findings "that electric rates for most citizens may further increase" and "that there is a wide rate disparity in electric rates both within New Hampshire and as compared to the region," were found to have "a particularly adverse impact on New Hampshire citizens." Laws 1996, 129:1, I. The legislature further found that the effects of the state's "extraordinarily high electric rates disadvantage all classes of customers," were "causing businesses to consider relocating or expanding out of state," and were "a significant impediment to economic growth and new job creation in this state." Laws 1996, 129:1, II. Accordingly, the legislature determined that "New Hampshire must aggressively pursue restructuring and increased consumer choice in order to provide electric service at lower and more competitive rates." Laws 1996, 129:1, III. To address these concerns, the legislature enacted RSA chapter 374-F.
 
 See
 
 RSA 374-F:1.
 

 As set forth in the statute, "[t]he
 
 most compelling reason
 
 to restructure the New Hampshire electric utility industry
 
 is to reduce costs for all consumers
 
 of electricity by harnessing the power of competitive markets." RSA 374-F:1, I (emphasis added). "The overall public policy goal of restructuring is to develop a more efficient industry structure and regulatory framework that results in a more productive economy
 
 by reducing costs to consumers
 
 while maintaining safe and reliable electric service with minimum adverse impacts on the environment."
 

 Id.
 

 (emphasis added).
 

 To that end, the statute identifies "interdependent policy principles" that "are intended to guide the New Hampshire public utilities commission in implementing a statewide electric utility industry restructuring plan, ... and in regulating a restructured electric utility industry." RSA 374-F:1, III. These 15 "Restructuring Policy Principles" (policy principles) include: "System Reliability"; "Customer Choice"; "Regulation and Unbundling of Services and Rates"; "Open Access to Transmission and Distribution Facilities"; "Universal Service"; "Benefits for All Consumers"; "Full and Fair Competition"; "Environmental Improvement"; "Renewable Energy Resources"; "Energy Efficiency"; "Near Term Rate Relief"; "Recovery of Stranded Costs"; "Regionalism"; "Administrative Processes"; and "Timetable." RSA 374-F:3, I-XV (2009 & Supp. 2017) (bolding and capitalization omitted).
 

 The specific policy principle at issue before us, the so-called "functional separation" principle, provides in pertinent part:
 

 III. Regulation and Unbundling of Services and Rates. When customer choice is introduced, services and rates
 
 should
 
 be unbundled to provide customers clear price information on the cost components of generation, transmission, distribution, and any other ancillary charges. Generation services
 
 should
 
 be subject to market competition and minimal economic regulation and at least functionally separated from transmission and distribution services which
 
 should
 
 remain regulated for the foreseeable future. However, distribution service companies
 
 should not
 
 be absolutely precluded from owning small scale distributed generation resources as part of a strategy for minimizing transmission and distribution costs.
 

 RSA 374-F:3, III (capitalization omitted). Algonquin and Eversource both argue that the proposed ANE Contract does not violate this provision of the statute because a gas contract for the purchase of capacity on a natural gas pipeline does not constitute "generation services." (Quotation omitted.) Eversource contends that it "is not proposing to combine any generation and distribution functions, nor is it proposing the ANE Contract as a means to engage
 in 'generation services' described in RSA 374-F:3, III," but, rather, "it is seeking to ensure long-term electric system reliability by supporting the delivery of adequate natural gas supplies to, among other end-users, the region's competitive gas-fired electric generators." Algonquin concurs that "Eversource's sole and critical role would be making primary firm natural gas capacity available-Eversource would not be providing or engaged in the generation of electricity." The appellees, on the other hand, contend that the purchase of gas capacity should be considered a component of electricity generation. We conclude that this issue cannot be decided as a matter of law, and, therefore, we decline to address it at this juncture.
 

 However, even assuming that Eversource's proposal could be considered to involve generation, that would not end the inquiry. The chapter does not prioritize the 15 restructuring policy principles contained in section 3. Nor does the chapter reflect any legislative intent that the "functional separation" policy principle is meant to "direct" the PUC in the exercise of its authority in implementing the chapter to the exclusion of the 14 remaining principles. The policy principles are identified as being "interdependent." RSA 374-F:1, III. The common definition of "interdependent" is "mutually dependent."
 
 Webster's Third New International Dictionary
 
 1177 (unabridged ed. 2002);
 
 see
 

 Woolf v. Fuller
 
 ,
 
 87 N.H 64
 
 , 68,
 
 174 A. 193
 
 (1934) (explaining that two provisions of law were "interdependent," meaning that "one qualif[ied] and limit[ed] the other; otherwise ... due effect could not be given to both at the same time"). As Algonquin points out, the PUC's order "does not ... discuss any of the other" policy principles, and, "by erroneously focusing on the Functional Separation Principle," the PUC did not consider whether "many, if not all, of the other fourteen [policy principles] would be advanced" by the proposed agreement.
 

 Furthermore, RSA 374-F:3 expressly states when such policy principles establish directives to the PUC.
 
 See, e.g.
 
 , RSA 374-F:3, I (2009) ("[r]eliable electricity service
 
 must
 
 be maintained" (emphasis added) ); RSA 374-F:3, V(a) (2009) ("[a] utility providing distribution services
 
 must
 
 have an obligation to connect all customers in its service territory to the distribution system" (emphasis added) ); RSA 374-F:3, V(c) (2009) ("[a]ny prudently incurred costs arising from compliance with the renewable portfolio standards ... for default service or purchased power agreements
 
 shall
 
 be recovered through the default service charge" (emphasis added) ); RSA 374-F:3, XII(a) (2009) ("in addressing claims for stranded cost recovery and fulfilling its responsibility to determine rates which are equitable, appropriate, and balanced and in the public interest ..., the [PUC]
 
 shall
 
 balance the interests of ratepayers and utilities during and after the restructuring process" (emphasis added) ).
 

 By contrast, other policy principles state only that the PUC "should" take certain factors into consideration, including that "[g]eneration services
 
 should
 
 be ... at least functionally separated from transmission and distribution services," RSA 374-F:3, III.
 
 See
 

 also
 
 ,
 
 e.g.
 
 , RSA 374-F:3, II (2009) ("[c]ustomers
 
 should
 
 be able to choose among options such as levels of service reliability, real time pricing, and generation sources" (emphasis added) ); RSA 374-F:3, IV (2009) ("[n]on-discriminatory open access to the electric system for wholesale and retail transactions
 
 should
 
 be promoted" (emphasis added) ); RSA 374-F:3, V(a) (2009) ("[e]lectric service is essential and
 
 should
 
 be available to all customers" and a "restructured electric utility industry
 
 should
 
 provide adequate safeguards to assure universal service" (emphasis
 added) ); RSA 374-F:3, VII (2009) ("[t]he rules that govern market activity
 
 should
 
 apply to all buyers and sellers in a fair and consistent manner" (emphasis added) ); RSA 374-F:3, VIII ("environmental protection and long term environmental sustainability
 
 should
 
 be encouraged" and "[i]ncreased competition in the electric industry
 
 should
 
 be implemented in a manner that supports and furthers the goals of environmental improvement" (emphasis added) ); RSA 374-F:3, IX (2009) ("[i]ncreased future commitments to renewable energy resources
 
 should
 
 be consistent with the New Hampshire energy policy" and "
 
 should
 
 be balanced against the impact on generation prices" (emphasis added) ); RSA 374-F:3, X (2009) ("[r]estructuring
 
 should
 
 be designed to reduce market barriers to investments in energy efficiency" (emphasis added) ); RSA 374-F:3, XIII (2009) ("New Hampshire
 
 should
 
 work with other New England and northeastern states to accomplish the goals of restructuring" and "
 
 should
 
 assert maximum state authority over the entire electric industry restructuring process" (emphasis added) ).
 

 The use of the word "should" allows the PUC to exercise its discretion and judgment; in contrast, the word "shall" establishes a mandatory duty.
 
 See
 

 Ford v. N.H. Dep't of Transp.
 
 ,
 
 163 N.H. 284
 
 , 296,
 
 37 A.3d 436
 
 (2012) ;
 
 Appeal of Psychiatric Institutes of America
 
 ,
 
 132 N.H. 177
 
 , 183,
 
 564 A.2d 818
 
 (1989). Had the legislature intended to require the PUC to prioritize the "functional separation" policy principle above all other principles identified in the statute, and to require "functional separation" in all circumstances, it would have said so. "Where the legislature fails to include in a statute a provision for mandatory enforcement that it has incorporated in other, similar contexts, we presume that it did not intend the law to have that effect and will not judicially engraft such a term."
 
 In the Matter of Bazemore & Jack
 
 ,
 
 153 N.H. 351
 
 , 354,
 
 899 A.2d 225
 
 (2006) ;
 
 see
 

 LLK Trust
 
 ,
 
 159 N.H. at 736
 
 ,
 
 992 A.2d 666
 
 (stating that we "will not consider what the legislature might have said or add language that the legislature did not see fit to include").
 

 Pursuant to its plain language, and reading the statute as a whole, we discern that the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers.
 
 See
 
 RSA 374-F:1, I. We disagree with the PUC's ruling that the legislature's "overriding purpose" was "to introduce competition to the generation of electricity." Rather, as the statute provides, the legislature intended to "harness[ ] the power of competitive markets," RSA 374-F:1, I, as a means to reduce costs to consumers, not as an end in itself.
 
 [4]
 

 See
 

 Appeal of Campaign for Ratepayers Rights
 
 ,
 
 145 N.H. 671
 
 , 673,
 
 766 A.2d 702
 
 (2001) (explaining that "the goal of restructuring was to create competitive markets that would produce lower prices for all customers than would have been paid under the then-current regulatory system" (quotation and brackets omitted) ). Likewise, we disagree with the PUC's ruling that RSA 374-F:3, III directs the "functional separation" of generation services from transmission and distribution
 services and elevates that single policy principle over the others identified in the statute.
 

 We acknowledge that the Massachusetts Supreme Judicial Court has interpreted that state's restructuring law differently than we do New Hampshire's statute.
 
 See
 

 ENGIE Gas v. Dep't of Public Utilities
 
 ,
 
 475 Mass. 191
 
 ,
 
 56 N.E.3d 740
 
 (2016). However, we disagree with the conclusion reached in that case for the reasons stated herein.
 

 We hold that the PUC erred in dismissing Eversource's petition as a matter of law. In light of our decision, we need not address the appellant's remaining arguments. Accordingly, we reverse the PUC's dismissal of the petition and remand to the agency for further proceedings consistent with this opinion.
 

 Reversed and remanded
 
 .
 

 HANTZ MARCONI, J., concurred; DALIANIS, C.J., retired, specially assigned under RSA 490:3, concurred; HICKS, J., dissented.
 

 Staff noted that it had received responses to its July 10 memorandum from seven stakeholders presenting "a wide diversity of views" on the issue of the authority of EDCs "acquiring gas pipeline capacity for the ultimate use of gas generators." After reviewing those responses, "and having considered the matter further," Staff re-adopted the conclusions set forth in its July memorandum.
 

 According to Eversource, the ANE pipeline project "is designed to provide increased natural gas deliverability to the New England region to support electric generation, including most directly, the gas-fired electric generating plants on the Algonquin and [Maritimes & Northeast Pipeline] systems."
 

 We note that no party suggests that the PUC's construction of the restructuring statute in the present case follows a consistent pattern by that agency of interpreting the statute in a similar fashion. Thus, this case does not present the situation wherein long-standing agency practice has placed an administrative gloss on an ambiguous statute that the legislature has not seen fit to alter.
 
 See
 

 Petition of Kalar
 
 ,
 
 162 N.H. 314
 
 , 321,
 
 27 A.3d 756
 
 (2011) ;
 
 DHB v. Town of Pembroke
 
 ,
 
 152 N.H. 314
 
 , 321,
 
 876 A.2d 206
 
 (2005). The absence of this factor undermines the appellees' argument for deference to the PUC's construction of the statute.
 

 Under the PUC's construction, the restructuring statute would preclude approval of Eversource's petition based upon the functional separation principle even if the agency were to conclude, following a full hearing, that the other policy principles identified in the statute clearly outweighed functional separation and that the proposal would produce more reliable electric service at lower rates for New Hampshire consumers than presently exists without any significant adverse consequences. We do not believe that RSA chapter 374-F can sensibly be construed in this fashion.